# EXHIBIT B



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Albert S. Penilla
MARTINE PENILLA & GENCARELLA, LLP
710 Lakeway Drive, Suite 200
Sunnyvale, CA 94085

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,403*.

PATENT NO. *5,675,734*.

ART UNIT *2132*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/007,403 | Patent Under Reexamination<br>5675734 |
|---|---|---|
| | Examiner<br>Benjamin E. Lanier. | Art Unit<br>2132 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on <u>27 December 2005</u> .    b☒ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.
2. ☒ Information Disclosure Statement, PTO-1449.    4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-34* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☒ Claims *5,20,21,26,27,29 and 30* have been canceled in the present reexamination proceeding.

3. ☐ Claims _____ are patentable and/or confirmed.

4. ☒ Claims *1-4, 6-19, 22-25, 28 and 31-34* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All   b)☐ Some*   c)☐ None   of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____.

   5☐ been received by the International Bureau in PCT application No. _____.

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)
U.S. Patent and Trademark Office
PTOL-466 (Rev. 04-01)                    Office Action in Ex Parte Reexamination                    Part of Paper No. 20060317

Application/Control Number: 90/007,403                                     Page 2
Art Unit: 2132

## DETAILED ACTION

### *Response to Arguments*

1.      Applicant's arguments filed 27 December 2005 have been fully considered but they are

not persuasive. Applicant's argument that obviousness-type double-patenting is not a new issue

related to patentability and is therefore inappropriate is not persuasive because double patenting

can provide a basis for a reexamination proceeding. *In re Lonardo*, 119 F.3d 960 (Fed. Cir.

1997); MPEP 2217, 2258. In Lonardo, the Federal Circuit reviewed and interpreted the language

of 35 U.S.C. 303 and stated that:

> Since the statute in other places refers to prior art in relation to reexamination, see id.,
>
> it seems apparent that Congress intended that the phrases patents and publications'
>
> and other patents or printed publications' in section 303(a) not be limited to prior art
>
> patents or printed publications... . Finally, it is reasonable to conclude that Congress
>
> intended to include double patenting over a prior patent as a basis for reexamination
>
> because maintenance of a patent that creates double patenting is as much of an
>
> imposition on the public as maintenance of patent that is unpatentable over prior art.
>
> Thus, we conclude that the PTO was authorized during reexamination to consider the
>
> question of double patenting based upon the `762 patent.

2.      *In re Lonardo*, 119 F.3d at 966, 43 USPQ2d at 1266. Accordingly, the issue of double

patenting is appropriate for consideration in reexamination, both as a basis for ordering

reexamination and during subsequent examination on the merits. The issue of double patenting is

to be considered by the examiner when making the decision on the request for reexamination.

The examiner should determine whether the issue of double patenting raises a substantial new

Application/Control Number: 90/007,403                                    Page 3
Art Unit: 2132

question of patentability. The issue of double patenting is also to be considered during the

examination stage of reexamination proceeding. In the examination stage, the examiner should

determine whether a rejection based on double patenting is appropriate.

3.      Applicant's arguments that the Examiner for the patent applications in question was

asked to consider the possibility of double patenting rejections on the co-pending applications

and therefore cannot be considered "substantial new question of patentability" is not persuasive

because since the application were copending, the corresponding claims could have been at

various stages of amendments. Therefore, it is impossible to determine at what state the

Examiner considered the claims for a potential double patenting rejection and therefore a

substantial new question of patentability exists.

4.      Applicant's argument that the obviousness-type double patenting rejection over claims 1-

63 of the '440 patent is improper because the rejection is unsupported by some suggestion in the

prior art, or the knowledge of one having ordinary skill in the art is not persuasive because all of

the limitations of current claim 1 are present in claims 1-7, 8 of the '440 patent and no

suggestion in the prior art, or the knowledge of one having ordinary skill in the art is required.

See *In re Goodman* (CA FC) 29 USPQ2d 2010 (12/3/1993)).

5.      "A later patent claim is not patentably distinct from an earlier patent claim if the later

claim is obvious over, or anticipated by, the earlier claim. *In re Longi*, 759 F.2d at 896, 225

USPQ at 651 (affirming a holding of obviousness-type double patenting because the claims at

issue were obvious over claims in four prior art patents); *In re Berg*, 140 F.3d at 1437, 46

USPQ2d at 1233 (Fed. Cir. 1998) (affirming a holding of obviousness-type double patenting

where a patent application claim to a genus is anticipated by a patent claim to a species within

Application/Control Number: 90/007,403                                      Page 4
Art Unit: 2132

that genus)." ELI LILLY AND COMPANY v BARR LABORATORIES, INC., United States
Court of Appeals for the Federal Circuit, ON PETITION FOR REHEARING EN BANC
(DECIDED: May 30, 2001).

6.      "Claim 12 and Claim 13 are generic to the species of invention covered by claim 3 of the
patent. Thus, the generic invention is "anticipated" by the species of the patented invention. Cf.,
Titanium Metals Corp. v. Banner, 778 F.2d 775, 227 USPQ 773 (Fed. Cir. 1985) (holding that an
earlier species disclosure in the prior art defeats any generic claim). This court's predecessor has
held that, without a terminal disclaimer, the species claims preclude issuance of the generic
application. *In re Van Ornum*, 686 F.2d 937, 944, 214 USPQ 761, 767 (CCPA 1982); Schneller,
397 F.2d at 354. Accordingly, absent a terminal disclaimer, claims 12 and 13 were properly
rejected under the doctrine of obviousness-type double patenting." (*In re Goodman* (CA FC) 29
USPQ2d 2010 (12/3/1993)).

7.      Applicant's argument that the obviousness-type double-patenting rejection over the '573
patent is inconsistent because claims 1-6 of the '573 patent are rejected under Akashi, in view of
Freeny, while claims 3-4, 6-19, 22-25, 28, and 31-34 are rejected under many more references is
not persuasive because the obviousness-type double-patenting analysis took into account current
claim 1 (rejected under Akashi, Freeny, Gallagher, and Ohta) and claims 1, 3 from the '573
patent (rejected under Akashi and Freeny). Therefore, the analysis provided added prior art
suggestions of Gallagher and Ohta along with a teaching of why one of ordinary skill in the art
would have been motivated to combine the teachings in order to show why the instant claims and
claims 1-6 from the '573 patent are not patentable distinct. Analysis of just claim 1 of the current
claims and claims 1, 3 from the '573 patent was done for brevity.

Application/Control Number: 90/007,403                                    Page 5
Art Unit: 2132

8.      In response to applicant's argument that the examiner has combined an excessive number

of references, reliance on a large number of references in a rejection does not, without more,

weigh against the obviousness of the claimed invention. See *In re Gorman*, 933 F.2d 982, 18

USPQ2d 1885 (Fed. Cir. 1991).

9.      In response to Applicant's arguments with respect to the Freeny reference, the District

Court considered the Freeny reference, in the analysis on pages 52-53, with respect to

anticipation and obviousness in view of only the teachings within the Freeny reference. Nowhere

does the court decision discuss a combination of Akashi and Freeny, as applied in this

reexamination proceeding, as being non-obvious.

10.     The Examiner disagrees with Applicant's assessment of Akashi as a simple inexpensive

digital audio tape recorder because Akashi clearly shows that the user device that communicates

with the host computer is a personal computer (paragraph 4). The recording device that

Applicant is referring to is a device/module of the personal computer; much the same as a hard

drive or a CD-ROM drive is a device/module of a personal computer.

11.     In response to applicant's argument that Freeny is nonanalogous art, it has been held that

a prior art reference must either be in the field of applicant's endeavor or, if not, then be

reasonably pertinent to the particular problem with which the applicant was concerned, in order

to be relied upon as a basis for rejection of the claimed invention. See *In re Oetiker*, 977

F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992). In this case, Akashi and Freeny both deal with

music purchasing over telecommunication lines that enable users access to requested music (See

Akashi page 1 and Freeny Col. 5, line 1 – Col. 6, line 23 & Col. 13, lines 27-31).

12.      Applicant argues that the proposed modification of Akashi, in view of Freeny, would

change the principle operation of the Akashi is not persuasive because the test for obviousness is

not whether the features of a secondary reference may be bodily incorporated into the structure

of the primary reference; nor is it that the claimed invention must be expressly suggested in any

one or all of the references.  Rather, the test is what the combined teachings of the references

would have suggested to those of ordinary skill in the art.  See *In re Keller*, 642 F.2d 413, 208

USPQ 871 (CCPA 1981). The proposed modification to the automated purchasing component of

Akashi, which isn't even described in the Akashi reference, would not change the principle

operation of the Akashi reference.  Akashi discloses that the digital music data is purchased

automatically but does not expressly detail how the purchase is transacted. Freeny discloses a

method of electronically distributing and selling audio and video data by way of having the

requesting user transmit a consumer credit card number along with their request for the audio

and video data (Col. 13, lines 25-29). This step allows the owner of the data to approve the sale

and charge the sale to the consumer credit card number (Col. 13, lines 30-31). It would have

been obvious to one of ordinary skill in the art at the time the invention was made to have the

requesting user's of Akashi transmit a consumer credit card number along with their request for

the digital data so that the source unit could approve and charge the sale of the digital data to the

consumer credit card because this method of electronic sale allows the owner of the information

to receive directly the compensation for sale of recording and such compensation is received

before the reproduction is authorized as taught in Freeny (Col. 13, lines 36-39). The subsequent

transmission of data in Akashi has not been modified, and therefore, suggesting that the

modification of the purchasing component of Akashi would change the principle operation of

Akashi is simply not true.

13.     Applicant's argument that the motivation for the proposed modification of the purchasing

component of Akashi with the electronic sales procedure of Freeny is not persuasive because the

motivation is not a conclusory statement but instead is teaching directly from the Freeny

reference. See motivation below:

> It would have been obvious to one of ordinary skill in the art at the time the invention
>
> was made to have the requesting user's of Akashi transmit a consumer credit card number
>
> along with their request for the digital data so that the source unit could approve and
>
> charge the sale of the digital data to the consumer credit card because this method of
>
> electronic sale allows the owner of the information to receive directly the compensation
>
> for sale of recording and such compensation is received before the reproduction is
>
> authorized as taught in Freeny (Col. 13, lines 36-39).

14.     This teaching in Freeny would lead one of ordinary skill in the art at the time the

invention was made to perform an electronic sale using credit card informaiton so that the seller

could receive direct compensation.

15.     In response to Applicant's argument that no showing of a reasonable expectation of

success has been made, the incorporation of the electronic payment steps of Freeny into the

automated purchasing system of Akashi allow for a seller to receive direct compensation for the

data that the automated purchasing system of Akashi allows to be sold.

16.     Applicant's argument that the combination of Akashi and Freeny do not suggest that

transmission of audio or video information from a remote location can be triggered by providing

credit card account information is not persuasive because taking into account the above-

mentioned modification of Akashi using the electronic payment steps of Freeny, the user's

request for the data from the host computer of Akashi would be accompanied with the user's

credit card information. At the remote cite, access to the data would be allowed once the credit

card information is authorized (See Freeny Col. 13, lines 27-39). In Akashi the access provided

to the user is done through telecommunication lines (i.e. data being transmitted from the host

computer to the user's personal computer over telecommunication lines)(See Akashi Page 1

through line 1 of Page 2 & Page 4 paragraph 1).

17.     Applicant's argument that modifying the host computer of Akashi to include a hard drive

to store the data files does not take into account the purpose of the system of Akashi is not

persuasive because modifying the host computer has nothing to do with the recording phase of

the Akashi system. Furthermore, modifying the user personal computer with a hard drive would

not be contrary to the purpose of the system of Akashi because if the user of the personal

computer intended to have a portable copy of the requested data, a hard drive on the user

personal computer would not hinder the recording process. Modifying the user's personal

computer with a hard drive would merely give the personal computer a larger and faster storage

medium (Ohta, Col. 1, lines 21-25, 38-42) for storage of the requested files before the recording

device would record them.

18.     Applicant arguments with respect to various elements of Freeny are not persuasive

because the test for obviousness is not whether the features of a secondary reference may be

bodily incorporated into the structure of the primary reference; nor is it that the claimed

invention must be expressly suggested in any one or all of the references. Rather, the test is what

the combined teachings of the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

19.     Applicant's arguments with respect to the hard drive of Gallagher is not persuasive because the teachings of Gallagher show it would have been obvious for the host computer of Akashi to have a hard drive. The source unit of Gallagher would be analogous to the host computer of Akashi. The teachings of Ohta show that it would have been obvious to one of ordinary skill in the art at the time the invention was made for the user's personal computer to have a hard drive for the various reasons stated in Ohta. The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

20.     Applicant's argument that no prior art reference has been cited to show the recording of audio or video information is not persuasive because, as stated on page 19 of the remarks, Gallagher discloses that the source unit, which stores the audio data, stores the data on a hard drive. The motivation to modify the Akashi reference was given as follows:

> It would have been obvious to one of ordinary skill in the art at the time the invention was made for the host computer storage means of Akashi and the personal computer storage means of Akashi to be a hard drives, because of the vast speed and because general computer configurations employ disk-based storage systems such as hard disk as taught in Ohta (Col. 1, lines 21-26).

Application/Control Number: 90/007,403                                    Page 10
Art Unit: 2132

21.     In response to applicant's argument that the examiner's conclusion of obviousness is
based upon improper hindsight reasoning, it must be recognized that any judgment on
obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning. But so
long as it takes into account only knowledge which was within the level of ordinary skill at the
time the claimed invention was made, and does not include knowledge gleaned only from the
applicant's disclosure, such a reconstruction is proper. See *In re McLaughlin*, 443 F.2d 1392,
170 USPQ 209 (CCPA 1971). Therefore, because the knowledge used for the conclusion of
obviousness comes directly from the cited prior art, the reconstruction is proper.

22.     Applicant's argument that none of the prior art references cite playing of audio
information as it is sent from a central location is not persuasive because it is not a claimed
limitation. Applicant claims playing the audio information once it is stored on the user computer.

23.     Applicant's argument that the Eggers reference does not disclose permanent copying of
video information is not persuasive because the Eggers reference is not being relied upon to
show permanent copying of the audio/video information. The Eggers reference shows that it
would have been obvious to modify the user's personal computer of Akashi so that the personal
computer includes playback means. The playback of the video information in Eggers is not
dependent on where the video information is stored, but rather that the video information is
obtained by the playback means. The motivation to combine is below:

> It would have been obvious to one of ordinary skill in the art at the time the invention
> was made for the personal computer of Akashi to retrieve the digital music data from
> storage upon a user request in order for the user access a large amount of digital music

data without having to utilize the traditional equipment used to playback those files as

taught in Eggers (Col. 14, line 67 – Col. 15, line 5).

24.    Applicant contends that the playback features of Eggers cannot be modified to the

technology of Akashi because the system of Eggers uses immediate playback. This assessment is

improper because the personal computers of Eggers have hard drives (Eggers, Col. 7, line 65),

and Eggers discloses that the data transferred between the central device and the user's personal

computer is stored in the hard drive of the personal computer (Col. 8, lines 1-3). Therefore, the

hard drive of the personal computer is an integral part of the playback process of Eggers.

Therefore, the motivation to combine has come fully from the cited prior art and not from

Applicant's disclosure.

25.    In response to applicant's argument that Thomas is completely silent with respect to

producing copies from recorded audio or video informaiton in the form of a tape or optical disk

and playing of audio or video information from a central library in response to a request, the test

for obviousness is not whether the features of a secondary reference may be bodily incorporated

into the structure of the primary reference; nor is it that the claimed invention must be expressly

suggested in any one or all of the references. Rather, the test is what the combined teachings of

the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642

F.2d 413, 208 USPQ 871 (CCPA 1981). Eggers does not disclose that the personal computers

used for playback contain a playback RAM. Thomas discloses an audio and video playback

workstation computer that contains a processor, hard drive, monitor, audio output device, video

playback memory, and audio playback memory (Col. 19, lines 36-50), which meets the

limitation of a transferring a replica of the desired digital video or digital audio signals from the

second party hard disk to the playback random access memory chip for playback and playing the

desired digital video or digital audio signals from the second party hard disk. It would have been

obvious to one of ordinary skill in the art at the time the invention was made to include an

additional RAM in the personal computers of Eggers for playback purposes in order to reduce

the amount of space taken up in system RAM by playback, which would allow more RAM space

for resident programs.

26.      In response to applicant's argument that Chace does not disclose the copying of audio or

video information and has nothing at all to do with the purchase or recording of video or audio

information, the test for obviousness is not whether the features of a secondary reference may be

bodily incorporated into the structure of the primary reference; nor is it that the claimed

invention must be expressly suggested in any one or all of the references.  Rather, the test is what

the combined teachings of the references would have suggested to those of ordinary skill in the

art.  See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981). Eggers discloses that the

personal computer has a monitor for video output/playback (Col. 4, lines 54) but does not

expressly disclose the form for the audio output/playback. Chace discloses a system for

audiovisual playback using a personal computer (Col. 5, lines 64-65) wherein the audio output

comprises stereo speakers (Col. 7, line 39), which meets the limitation of speakers in possession

and control of the second party and in electrical communication with said second control

integrated circuit. It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use stereo speakers as the audio output in the playback system of Eggers

in order to provide a more realistic and more pleasing sound to the ear as taught in Chace (Col. 1,

lines 32-33).

Application/Control Number: 90/007,403                                    Page 13
Art Unit: 2132

27.     All of the Applicant's arguments with the respect to the 103 rejections represent attacks

on the references individually where the rejections are based on combinations of references and

they represent allegations that various features of the secondary references cannot be bodily

incorporated into the structure of the primary reference. These arguments cannot be relied upon

to show nonobviousness. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re

Merck & Co.,* 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).

28.     Therefore, the cited prior art references were considered as a whole when making the

claim rejections and would have suggested to those of ordinary skill in the art the above-

mentioned combinations.

29.     Applicant's arguments with respect to commercial success are not persuasive because

commercial success may have been attributable to extensive advertising and position as a market

leader before the introduction of the patented product, Pentec, Inc. v. Graphic Controls Corp.,

776 F.2d 309, 227 USPQ 766 (Fed. Cir. 1985). The Napster name gained worldwide notoriety in

the late 1990's because of their software which allowed users to illegally download music. At its

height, Napster had 70 million unique users who were estimated to have traded over 3 billion

files a month (See Wired News "Napster is Alive, Alive", Page 3). This would have given

Napster's legitimate online music store a starting base of 70 million users who were familiar

with Napster products prior to their online music store's launch. Therefore, Applicant has failed

to show that the commercial success of the Napster Light software is due to the alleged use of

Applicant's claimed invention instead of being a direct result of Napster's prominent name with

respect to music downloading.

Application/Control Number: 90/007,403                                          Page 14
Art Unit: 2132

30.     Success of invention could be due to recent changes in related technology or consumer

demand, In re Fielder, 471 F.2d 690, 176 USPQ 300 (CCPA 1973). The existence and

profitability of the systems mentioned by Applicant are due to the advances in recent technology

and not Applicant's claimed invention. If the latter was responsible for the success, then it stands

to reason that the existence of a profitable system would have occurred earlier since Applicant's

first application directed to the claimed subject matter was filed in June of 1988. At the time of

Napster Light's ("Napster") launch, personal computer storage capacities were significantly

larger than they were at the time of the prior art systems. Hard drives routinely come in

capacities of 20 gigabytes or higher, whereas in 1988 the capacity was around 40 megabytes. Not

to mention the fact that when Napster was launched, audio file compression was advanced to the

point where a file could be compressed to a third of the size with little observable quality loss.

Add to that the proliferation of broadband Internet that simply did not exist at the time of prior

art systems and what you have is the ability to store a significantly larger amount of music

because of file size and storage capacity, and the ability to acquire this music much faster.

Therefore, Applicant cannot attribute the commercial success of Napster's system to the alleged

use of their claimed invention when there is no reason to suggest that any of the prior art

distribution system would not have been just as successful given these same advances in

technology.

### *Double Patenting*

31.     The nonstatutory double patenting rejection is based on a judicially created doctrine
grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or
improper timewise extension of the "right to exclude" granted by a patent and to prevent possible
harassment by multiple assignees. See *In re Goodman,* 11 F.3d 1046, 29 USPQ2d 2010 (Fed.
Cir. 1993); *In re Longi,* 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum,* 686

Application/Control Number: 90/007,403                                            Page 15
Art Unit: 2132

F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel,* 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and *In re Thorington,* 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

    A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent is shown to be commonly owned with this application.  See 37 CFR 1.130(b).

    Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer.  A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

32.    Claims 1-4, 6-19, 22-25, 28, and 31-34 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 5,191,573 in view of Ohta, U.S. Patent No. 4,896,237, in view of Gallagher.  Current claim 1 is invalid for double patenting in view of claims 1 and 3 of the '573 patent. The only differences between current claim 1 and claims 1 and 3 of the '573 patent are hard drives at the first and second parties and electronically coding the digital data to prevent unauthorized reproduction. These features do not render the claims patentably distinct because it would have been obvious to one of ordinary skill in the art at the time the invention was made for the host computer storage means of Akashi and the personal computer storage means of Akashi to be a hard drives, because of the vast speed and because general computer configurations employ disk-based storage systems such as hard disk as taught in Ohta (Col. 1, lines 21-26). Furthermore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to encode or encrypt the recorded music data of Akashi in order to provide a possible means for eliminating borrowing or unlawful copying of the digital music data as taught in Gallagher (Col. 1, lines 51-53).

33.    Claims 1-4, 6-19, 22-25, 28, and 31-34 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-63 of U.S. Patent No.

5,966,440. Although the conflicting claims are not identical, they are not patentably distinct

from each other because the current claim limitations are present in the claims of the '440 patent.

For instance, all of the limitations of current claim 1 are present in claims 1-7, 8 of the '440

patent (see below).

Claim 1 (original): A method for transferring desired digital video or digital audio signals

comprising the steps of:

forming a connection through telecommunications lines between a first memory of a first

party at a first party location and a second memory of a second party at a second party location

remote from the first party location, said first memory having a first party hard disk having a

plurality of digital video or digital audio signals including coded desired digital video or digital

audio signals, and a sales random access memory chip which temporarily stores a replica of the

coded desired digital video or digital audio signals purchased by the second party for subsequent

transfer via telecommunications lines to the second memory of the second party; (Claims 1, 7)

telephoning the first party controlling use of the first memory by the second party ;

(Claim 4)

providing a credit card number of the second party controlling the second memory to the

first party controlling the first memory so the second party is charged money; (Claims 2-4)

electronically coding the desired digital video or digital audio signals to form said coded

desired digital video or digital audio signals into a configuration which would prevent

unauthorized reproduction of the desired digital video or digital audio signals; (Claim 6)

storing a replica of the coded desired digital video or digital audio signals from the hard

disk into the sales random access memory chip; (Claim 7)

transferring the stored replica of the coded desired digital video or digital audio signals

from the sales random access memory chip of the first party to the second memory of the second

party through telecommunications lines while the second memory is in possession and control of

the second party; (Claims 5, 9)

and storing the transferred replica of the coded desired digital video or digital audio

signals in the second memory. (Claims 5, 9)

34.    "A later patent claim is not patentably distinct from an earlier patent claim if the later

claim is obvious over, or anticipated by, the earlier claim. *In re Longi*, 759 F.2d at 896, 225

USPQ at 651 (affirming a holding of obviousness-type double patenting because the claims at

issue were obvious over claims in four prior art patents); *In re Berg*, 140 F.3d at 1437, 46

USPQ2d at 1233 (Fed. Cir. 1998) (affirming a holding of obviousness-type double patenting

where a patent application claim to a genus is anticipated by a patent claim to a species within

that genus)." ELI LILLY AND COMPANY v BARR LABORATORIES, INC., United States

Court of Appeals for the Federal Circuit, ON PETITION FOR REHEARING EN BANC

(DECIDED: May 30, 2001).

35.    "Claim 12 and Claim 13 are generic to the species of invention covered by claim 3 of the

patent. Thus, the generic invention is "anticipated" by the species of the patented invention. Cf,

Titanium Metals Corp. v. Banner, 778 F.2d 775, 227 USPQ 773 (Fed. Cir. 1985) (holding that an

earlier species disclosure in the prior art defeats any generic claim). This court's predecessor has

held that, without a terminal disclaimer, the species claims preclude issuance of the generic

application. *In re Van Ornum*, 686 F.2d 937, 944, 214 USPQ 761, 767 (CCPA 1982); Schneller,

397 F.2d at 354. Accordingly, absent a terminal disclaimer, claims 12 and 13 were properly

Application/Control Number: 90/007,403                                    Page 18
Art Unit: 2132

rejected under the doctrine of obviousness-type double patenting." (*In re Goodman* (CA FC) 29

USPQ2d 2010 (12/3/1993)).

### *Claim Rejections - 35 USC § 103*

36.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

37.     The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966), that are applied for establishing a background for determining obviousness under 35

U.S.C. 103(a) are summarized as follows:

    1.     Determining the scope and contents of the prior art.
    2.     Ascertaining the differences between the prior art and the claims at issue.
    3.     Resolving the level of ordinary skill in the pertinent art.
    4.     Considering objective evidence present in the application indicating obviousness
           or nonobviousness.

38.     Claims 1-2 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Gallagher, in view of Ohta, U.S. Patent No. 4,896,237. Referring to claims 1, 2, Akashi

discloses a system for automatically selling recorded music via telecommunication lines using a

personal computer (Page 1 through line 1 of Page 2 & Page 3, lines 3-5). Akashi discloses that

personal computer contains a CPU (Figure 1), which meets the limitation of a second party

integrated circuit which controls and executes commands of the second party. The personal

computer sends an access signal to the host computer, and the host computer returns a response

signal that contains menu data displayed at the personal computer (Page 3 Paragraph 6). Using

the monitor screen, the user chooses desired data using a control unit and sending the selection

data to the host computer in the same way the initial transmission was sent (Page 4 Paragraph 1),

which meets the limitation of forming a connection through telecommunications lines between a

first memory of a first party at a first party location and a second memory of a second party at a

second party location remote from the first party location, telephoning the first party controlling

use of the first memory by the second party, a second party control panel connected to the second

party integrated circuit, commanding the second party integrated circuit with the second party

control panel to initiate the purchase of the desired digital video or digital audio signals from the

first party. When the desired data has been found, the host computer transmits it to the personal

computer where it is stored on the computer RAM (Page 4 Paragraph 1), which meets the

limitation of transferring the stored replica of the desired digital video or digital audio signals

from the memory of the first party to the second memory of the second party through

telecommunications lines while the second memory is in possession and control of the second

party. Akashi discloses automated purchasing of the digital music is conducted between the host

computer and the user personal computer (Page 2 Section 4), and is further detailed on page 3,

paragraph 6, through Page 4, paragraph 1. Akashi does not detail how this automated purchasing

procedure is conducted between the host computer and the user personal computer. Freeny

discloses a method of electronically distributing and selling audio and video data by way of

having the requesting user transmit a consumer credit card number along with their request for

the audio and video data (Col. 13, lines 25-29). This step allows the owner of the data to approve

the sale and charge the sale to the consumer credit card number (Col. 13, lines 30-31), which

meets the limitation of providing a credit card number of the second party controlling the second

memory to the first party controlling the first memory so the second party is charged money. It

would have been obvious to one of ordinary skill in the art at the time the invention was made to

have the requesting user's of Akashi transmit a consumer credit card number along with their

request for the digital data so that the source unit could approve and charge the sale of the digital

data to the consumer credit card because this method of electronic sale allows the owner of the

information to receive directly the compensation for sale of recording and such compensation is

received before the reproduction is authorized as taught in Freeny (Col. 13, lines 36-39).

Gallagher discloses that the host computer storage means is a hard disk (Col. 1, lines 13-18, 32-

33), which is not expressly disclosed in Akashi. Akashi also does not disclose that the personal

computer stores the digital music data on a hard disk. It would have been obvious to one of

ordinary skill in the art at the time the invention was made for the host computer storage means

of Akashi and the personal computer storage means of Akashi to be a hard drives, because of the

vast speed and because general computer configurations employ disk-based storage systems such

as hard disk as taught in Ohta (Col. 1, lines 21-26), which meets the limitation of first memory

having a first party hard disk having a plurality of digital video or digital audio signals. The

source unit of Gallagher discloses having a buffer store RAM (Figures 1-2) between the

transmitter and the storage means. It would have been obvious to one of ordinary skill in the art

at the time the invention was made to include RAM in the host computer of Akashi in order to

speed up the transmission process by allowing the transmitter to access data in RAM as opposed

to a permanent storage device which is significantly slower, which meets the limitation of a sales

random access memory which temporarily stores a replica of the coded desired digital video or

digital audio signals purchased by the second party for subsequent transfer via

telecommunications lines to the second memory of the second party, storing a replica of the

coded desired digital video or digital audio signals from the hard disk into the sales random

access memory chip. Akashi does not disclose that the host computer encodes the digital music

data to prevent unauthorized reproduction. Gallagher discloses a system for the transfer of

recorded data wherein a host computer transmits digital audio data to user units (Col. 1, lines 13-

27). The host computer provides means for anti-piracy encoding or encrypting the data either

generally or uniquely (Col. 1, lines 36-38), which meets the limitation of electronically coding

the desired digital video or digital audio signals to form said coded desired digital video or

digital audio signals into a configuration which would prevent unauthorized reproduction of the

desired digital video or digital audio signals. It would have been obvious to one of ordinary skill

in the art at the time the invention was made to encode or encrypt the recorded music data of

Akashi in order to provide a possible means for eliminating borrowing or unlawful copying of

the digital music data as taught in Gallagher (Col. 1, lines 51-53).

39.      Claims 3, 4, 6-11 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Gallagher, in view of Ohta, U.S. Patent No. 4,896,237, as applied to claims 1, 2, above, and

further in view of Eggers, U.S. Patent No. 4,920,432, in view of Thomas, U.S. Patent No.

4,739,398. Referring to claims 3, 4, Akashi discloses that the host computer then sends the data

to the user personal computer RAM (Page 2 Section 5), which meets the limitation of the second

memory of the second party control unit includes an incoming random access memory chip

which temporarily stores the desired digital video or digital audio signals received from the sales

random access memory chip, storing step includes the steps of storing the desired digital video or

digital audio signals in the incoming random access memory chip. Akashi does not expressly

disclose playing back the stored digital audio. Eggers discloses a system for the playback of

audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which

contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular

audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the

requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets

the limitation of causing the second party integrated circuit with the second party control panel to

play the desired digital video or digital audio signals from the second party hard disk. It would

have been obvious to one of ordinary skill in the art at the time the invention was made for the

personal computer of Akashi to retrieve the digital music data from storage upon a user request

in order for the user access a large amount of digital music data without having to utilize the

traditional equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col. 15,

line 5). Eggers does not disclose that the personal computers used for playback contain a

playback RAM. Thomas discloses an audio and video playback workstation computer that

contains a processor, hard drive, monitor, audio output device, video playback memory, and

audio playback memory (Col. 19, lines 36-50), which meets the limitation of a transferring a

replica of the desired digital video or digital audio signals from the second party hard disk to the

playback random access memory chip for playback and playing the desired digital video or

digital audio signals from the second party hard disk. It would have been obvious to one of

ordinary skill in the art at the time the invention was made to include an additional RAM in the

personal computers of Eggers for playback purposes in order to reduce the amount of space

Application/Control Number: 90/007,403                                                  Page 23
Art Unit: 2132

taken up in system RAM by playback, which would allow more RAM space for resident

programs.

  Referring to claim 6, Akashi discloses a system for automatically selling recorded music

via telecommunication lines using a personal computer (Page 1 through line 1 of Page 2 & Page

3, lines 3-5). Akashi discloses that personal computer contains a CPU (Figure 1). The personal

computer sends an access signal to the host computer, and the host computer returns a response

signal that contains menu data displayed at the personal computer (Page 3 Paragraph 6), which

meets the limitation of the first party control unit includes a first party control integrated circuit

which controls and executes commands of the first party and is connected to the first party hard

disk (discussed above), the first party sales random access memory (discussed above), and the

second party control panel through the telecommunications lines (discussed above), and a first

party control panel through which the first party control integrated circuit is programmed and is

sent commands and which is connected to the first party control integrated circuit.

  Referring to claim 7, Akashi discloses that personal computer contains a CPU (Figure 1).

The personal computer sends an access signal to the host computer, and the host computer

returns a response signal that contains menu data displayed at the personal computer (Page 3

Paragraph 6). Using the monitor screen, the user chooses desired data using a control unit and

sending the selection data to the host computer in the same way the initial transmission was sent

(Page 4 Paragraph 1), which meets the limitation of the second party control unit includes a

second party control integrated circuit which controls and executes commands of the second

party and is connected to the second party hard disk (discussed above), the playback random

access memory (discussed above), and the first party control integrated circuit through the

telecommunications lines (discussed above), said second party control integrated circuit and said

first party control integrated circuit regulate the transfer of the desired digital video or audio

signals, and a second party control panel through which the second party control integrated

circuit is programmed and is sent commands and which is connected to the second party

integrated circuit.

Referring to claim 8, Akashi discloses that the host computer then sends the data to the

user personal computer RAM (Page 2 Section 5), which meets the limitation of the second

memory includes an incoming random access memory chip connected to the second party hard

disk (discussed above) and the second party control integrated circuit (discussed above), and the

first party control unit through the telecommunications lines for temporarily storing the desired

digital video or audio signals received from the first party's control unit for subsequent storage to

the second party hard disk (discussed above).

Referring to claim 9, Akashi discloses that the personal computer contains a monitor

(Page 4, Paragraph 1), which meets the limitation of a video display unit connected to the

playback random access memory chip (discussed above) and to the second party integrated

circuit (discussed above) for displaying the desired digital video or audio signals.

Referring to claim 10, Akashi discloses that the telecommunication lines are telephone

lines (Page 4, Paragraph 1).

40.      Claims 11, 12, 15 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Gallagher, in view of Eggers, U.S. Patent No. 4,920,432, in view of Thomas, U.S. Patent No.

4,739,398. Referring to claim 11, Akashi discloses a system for automatically selling recorded

music via telecommunication lines using a personal computer (Page 1 through line 1 of Page 2 &

Page 3, lines 3-5). Akashi discloses that personal computer contains a CPU (Figure 1), which

meets the limitation of a second party integrated circuit. The personal computer sends an access

signal to the host computer, and the host computer returns a response signal that contains menu

data displayed at the personal computer (Page 3 Paragraph 6). Using the monitor screen, the user

chooses desired data using a control unit and sending the selection data to the host computer in

the same way the initial transmission was sent (Page 4 Paragraph 1), which meets the limitation

of means or a mechanism for connecting electronically via the telecommunications lines the first

memory with the second memory such that the desired digital video or digital audio signals can

pass therebetween, said connecting means or mechanism in electrical communication with the

transferring means or mechanism, said connecting means or mechanism comprises a first control

unit in possession and control of the first party, and a second control unit in possession and

control of the second party, said first control unit comprises a first control panel, first control

integrated circuit, said second control unit comprising a second control panel, a second control

integrated circuit.  When the desired data has been found, the host computer transmits it to the

personal computer where it is stored on the computer RAM (Page 4 Paragraph 1), which meets

the limitation of a first memory in possession and control of the first party, a second memory in

possession and control of the second party, said second memory is at a location remote from said

first party, an incoming random access memory in electrical communication with said second

integrated circuit, means or a mechanism for transmitting the desired digital video or digital

audio signals from the first memory to the second memory, said means or mechanism for

transmitting comprising a transmitter connected to the first memory and the telecommunications

lines and a receiver connected to the second memory, the transmitter and the telecommunications

lines, said first party in control and possession of the transmitter, said second party in control and

possession of the receiver, said receiver remote from said transmitter and said receiver at a

location determined by the second party, said transmitting means or mechanism in electrical

communication with said connecting means or mechanism, means or a mechanism for storing the

desired digital video or digital audio signals from the first memory in the second memory, said

storing means or mechanism in electrical communication with said receiver of said transmitting

means or mechanism and with said second memory. Akashi discloses automated purchasing of

the digital music is conducted between the host computer and the user personal computer (Page 2

Section 4), and is further detailed on page 3, paragraph 6, through Page 4, paragraph 1. Akashi

does not detail how this automated purchasing procedure is conducted between the host

computer and the user personal computer. Freeny discloses a method of electronically

distributing and selling audio and video data by way of having the requesting user transmit a

consumer credit card number along with their request for the audio and video data (Col. 13, lines

25-29). This step allows the owner of the data to approve the sale and charge the sale to the

consumer credit card number (Col. 13, lines 30-31), which meets the limitation of means or a

mechanism for transferring money electronically via telecommunications lines from the second

party controlling use and in possession of the second memory to the first party controlling use

and in possession of the first memory. It would have been obvious to one of ordinary skill in the

art at the time the invention was made to have the requesting user's of Akashi transmit a

consumer credit card number along with their request for the digital data so that the source unit

could approve and charge the sale of the digital data to the consumer credit card because this

method of electronic sale allows the owner of the information to receive directly the

compensation for sale of recording and such compensation is received before the reproduction is

authorized as taught in Freeny (Col. 13, lines 36-39). The source unit of Gallagher discloses

having a buffer store RAM (Figures 1-2) between the transmitter and the storage means. It would

have been obvious to one of ordinary skill in the art at the time the invention was made to

include RAM in the host computer of Akashi in order to speed up the transmission process by

allowing the transmitter to access data in RAM as opposed to a permanent storage device which

is significantly slower, which meets the limitation of a sales random access memory in electrical

communication with said first control integrated circuit. Akashi does not expressly disclose

playing back the stored digital audio. Eggers discloses a system for the playback of audio/video

data wherein users operating a personal computer (Col. 4, lines 53-56), which contains RAM

(Col. 12, lines 30-32), requests a storage device to retrieve a particular audio/video file (Col. 6,

lines 8-15). The requested file is then pulled from storage and sent to the requesting personal

computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5). It would have been obvious to

one of ordinary skill in the art at the time the invention was made for the personal computer of

Akashi to retrieve the digital music data from storage upon a user request in order for the user

access a large amount of digital music data without having to utilize the traditional equipment

used to playback those files as taught in Eggers (Col. 14, line 67 – Col. 15, line 5). Eggers does

not disclose that the personal computers used for playback contain a playback RAM. Thomas

discloses an audio and video playback workstation computer that contains a processor, hard

drive, monitor, audio output device, video playback memory, and audio playback memory (Col.

19, lines 36-50), which meets the limitation of a playback random access memory in electrical

communication with said second control integrated circuit. It would have been obvious to one of

ordinary skill in the art at the time the invention was made to include an additional RAM in the

personal computers of Eggers for playback purposes in order to reduce the amount of space

taken up in system RAM by playback, which would allow more RAM space for resident

programs.

Referring to claims 12, 15, Akashi discloses that the telecommunication lines are

telephone lines (Page 4, Paragraph 1).

41.     Claim 13 is rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Gallagher, in view of Eggers, U.S. Patent No. 4,920,432, in view of Thomas, U.S. Patent No.

4,739,398, as applied to claims 11, 12 and further in view of Ohta, U.S. Patent No. 4,896,237.

Referring to claim 13, Gallagher discloses that the host computer storage means is a hard disk

(Col. 1, lines 13-18, 32-33), which is not expressly disclosed in Akashi. Akashi also does not

disclose that the personal computer stores the digital music data on a hard disk. It would have

been obvious to one of ordinary skill in the art at the time the invention was made for the host

computer storage means of Akashi and the personal computer storage means of Akashi to be a

hard drives, which meets the limitation of the first memory comprises a first hard disk and the

second memory comprises a second hard disk, because of the vast speed and because general

computer configurations employ disk-based storage systems such as hard disk as taught in Ohta

(Col. 1, lines 21-26).

42.     Claim 14 is rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Gallagher, in view of Eggers, U.S. Patent No. 4,920,432, in view of Thomas, U.S. Patent No.

4,739,398, in view of Ohta, U.S. Patent No. 4,896,237, as applied to claims 11-13 and further in

view of Chace, U.S. Patent No. 4,792,974. Referring to claim 14, Akashi discloses that the

personal computer of the user contains a monitor (Page 4, Paragraph 1), which meets the

limitation of a monitor in electrical communication with said second control integrated circuit

Eggers discloses that the personal computer has a monitor for video output/playback (Col. 4,

lines 54) but does not expressly disclose the form for the audio output/playback. Chace discloses

a system for audiovisual playback using a personal computer (Col. 5, lines 64-65) wherein the

audio output comprises stereo speakers (Col. 7, line 39), which meets the limitation of speakers

in possession and control of the second party and in electrical communication with said second

control integrated circuit. It would have been obvious to one of ordinary skill in the art at the

time the invention was made to use stereo speakers as the audio output in the playback system of

Eggers in order to provide a more realistic and more pleasing sound to the ear as taught in Chace

(Col. 1, lines 32-33).

43.      Claims 16, 17, 28, 31-34 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Akashi, "Automated Music Purchasing System", in view of Ohta, U.S. Patent No. 4,896,237, in

view of Freeny, U.S. Patent No. 4,528,643, in view of Gallagher, in view of Eggers, U.S. Patent

No. 4,920,432, in view of Thomas, U.S. Patent No. 4,739,398. Referring to claim 16, Akashi

discloses a system for automatically selling recorded music via telecommunication lines using a

personal computer (Page 1 through line 1 of Page 2 & Page 3, lines 3-5). Akashi discloses that

personal computer contains a CPU (Figure 1), which meets the limitation of a second party

integrated circuit. The personal computer sends an access signal to the host computer, and the

host computer returns a response signal that contains menu data displayed at the personal

computer (Page 3 Paragraph 6). Using the monitor screen, the user chooses desired data using a

control unit and sending the selection data to the host computer in the same way the initial

transmission was sent (Page 4 Paragraph 1). When the desired data has been found, the host

computer transmits it to the personal computer where it is stored on the computer RAM (Page 4

Paragraph 1), which meets the limitation of a first memory at a first party location, said first

memory in possession and control of the first party, a second memory in possession and control

of the second party, wherein said second memory is at a second party location remote from said

first memory, telecommunications lines, means or a mechanism for connecting electronically via

telecommunications lines the first memory with the second memory such that the desired digital

video or digital audio signals can pass therebetween, said connecting means or mechanism in

electrical communication with the transferring means or mechanism, said connecting means or

mechanism comprises a first control unit disposed at the first party location and a second control

unit disposed at the second party location remote from the said first control unit, said first control

unit comprises a first control panel, first control integrated circuit, said second control unit

comprising a second control panel, a second control integrated circuit, and an incoming random

access memory which temporarily stores the desired digital video or digital audio signals

transmitted from the first party and in electrical communication with the second control

integrated circuit, the transmitter and the telecommunications lines, said first party in control and

possession of the transmitter, said second party in control and possession of the receiver, said

receiver remote from said transmitter, and said receiver at the second party location determined

by the second party, said transmitting means or mechanism in electrical communication with said

connecting means or mechanism, means or a mechanism for storing the desired digital video or

digital audio signals in the incoming random access memory, said storing means or mechanism

in electrical communication with said receiver of said transmitting means or mechanism.

Gallagher discloses that the host computer storage means is a hard disk (Col. 1, lines 13-18, 32-

33), which is not expressly disclosed in Akashi. Akashi also does not disclose that the personal

computer stores the digital music data on a hard disk. It would have been obvious to one of

ordinary skill in the art at the time the invention was made for the host computer storage means

of Akashi and the personal computer storage means of Akashi to be a hard drives, because of the

vast speed and because general computer configurations employ disk-based storage systems such

as hard disk as taught in Ohta (Col. 1, lines 21-26), which meets the limitation of the first

memory comprises a first hard disk in which the desired digital video or digital audio signals are

stored and in electrical communication with the first control integrated circuit and the second

memory comprises a second hard disk in which the desired digital video or digital audio signals

are stored that are received from the first memory and in electrical communication with the

second control integrated circuit. Akashi discloses automated purchasing of the digital music is

conducted between the host computer and the user personal computer (Page 2 Section 4), and is

further detailed on page 3, paragraph 6, through Page 4, paragraph 1. Akashi does not detail how

this automated purchasing procedure is conducted between the host computer and the user

personal computer. Freeny discloses a method of electronically distributing and selling audio and

video data by way of having the requesting user transmit a consumer credit card number along

with their request for the audio and video data (Col. 13, lines 25-29). This step allows the owner

of the data to approve the sale and charge the sale to the consumer credit card number (Col. 13,

lines 30-31), which meets the limitation of means or a mechanism for the first party to charge a

fee to the second party and provide access to the desired digital video or digital audio signals at

the first party location remote from the second party location, said first party controlling use of

the first memory, said second party controlling use and in possession of the second memory, said

means or mechanism for the first party to charge a fee includes means or a mechanism for

transferring money electronically from the second party via telecommunications lines to the first

party at the first party location remote from the second memory at the second party location. It

would have been obvious to one of ordinary skill in the art at the time the invention was made to

have the requesting user's of Akashi transmit a consumer credit card number along with their

request for the digital data so that the source unit could approve and charge the sale of the digital

data to the consumer credit card because this method of electronic sale allows the owner of the

information to receive directly the compensation for sale of recording and such compensation is

received before the reproduction is authorized as taught in Freeny (Col. 13, lines 36-39). The

source unit of Gallagher discloses having a buffer store RAM (Figures 1-2) between the

transmitter and the storage means. It would have been obvious to one of ordinary skill in the art

at the time the invention was made to include RAM in the host computer of Akashi in order to

speed up the transmission process by allowing the transmitter to access data in RAM as opposed

to a permanent storage device which is significantly slower, which meets the limitation of a sales

random access memory for temporarily storing a replica of the desired digital video or digital

audio signals to be transmitted from the first control unit and in electrical communication with

said first control integrated circuit, transmitting the desired digital video or digital audio signals

from the sales random access memory to the incoming random access memory, a transmitter

connected to the sales random access memory and the telecommunications lines and a receiver connected to the incoming random access memory. Akashi does not expressly disclose playing back the stored digital audio. Eggers discloses a system for the playback of audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5). It would have been obvious to one of ordinary skill in the art at the time the invention was made for the personal computer of Akashi to retrieve the digital music data from storage upon a user request in order for the user access a large amount of digital music data without having to utilize the traditional equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col. 15, line 5). Eggers does not disclose that the personal computers used for playback contain a playback RAM. Thomas discloses an audio and video playback workstation computer that contains a processor, hard drive, monitor, audio output device, video playback memory, and audio playback memory (Col. 19, lines 36-50), which meets the limitation of a playback random access memory connected to the incoming random access memory for temporarily storing a replica of the desired digital video signals or digital audio signals to be played and in electrical communication with said second control integrated circuit. It would have been obvious to one of ordinary skill in the art at the time the invention was made to include an additional RAM in the personal computers of Eggers for playback purposes in order to reduce the amount of space taken up in system RAM by playback, which would allow more RAM space for resident programs.

Application/Control Number: 90/007,403
Art Unit: 2132

Page 34

Referring to claim 17, Akashi discloses that the telecommunication lines are telephone lines (Page 4, Paragraph 1).

Referring to claims 28, 31-34, Akashi discloses a system for automatically selling recorded music via telecommunication lines using a personal computer (Page 1 through line 1 of Page 2 & Page 3, lines 3-5). Akashi discloses that personal computer contains a CPU (Figure 1). The personal computer sends an access signal to the host computer, and the host computer returns a response signal that contains menu data displayed at the personal computer (Page 3 Paragraph 6), which meets the limitation of a first party control unit and a second party control unit, the first party control unit includes a first party integrated circuit which controls and executes commands of the first party and is connected to the second party control integrated circuit through the telecommunications lines, said first party control integrated circuit and said second party control integrated circuit regulate the transfer of the desired digital video or audio signals, and a first party control panel through which the first party control integrated circuit is programmed and is sent commands and which is connected to the first party control integrated circuit, the second party control unit includes a second party control integrated circuit which controls and executes commands of the second party, and a second party control panel through which the second party control integrated circuit is programmed and is sent commands and which is connected to the second party integrated circuit. Using the monitor screen, the user chooses desired data using a control unit and sending the selection data to the host computer in the same way the initial transmission was sent (Page 4 Paragraph 1), which meets the limitation of a second party control unit having a second party control panel, second party control unit remote from the first party control unit, said second party control unit placed by the second party

at a location determined by the second party, the second party control unit includes a video

display unit connected to the second party integrated circuit for displaying the desired digital

video or audio signals. When the desired data has been found, the host computer transmits it to

the personal computer where it is stored on the computer RAM (Page 4 Paragraph 1), which

meets the limitation of a second memory connected to the second party control panel, said

second party control unit place by the second party at a location determined by the second party,

telecommunications lines connected to the first party control unit and the second party control

unit through which the sales of the desired digital video or digital audio signals occur of the first

party's memory, and over which the desired digital video or digital audio signals of the first

party's memory are electronically transferred from the first party memory to the second memory

while the second party is in possession and control of the second memory, an incoming random

access memory connected to the second party control integrated circuit, and the first party

control unit through the telecommunications lines for temporarily storing the desired digital

video or audio signals received from the first party's control unit for subsequent storage to the

second party hard disk. Gallagher discloses that the host computer storage means is a hard disk

(Col. 1, lines 13-18, 32-33), which is not expressly disclosed in Akashi. Akashi also does not

disclose that the personal computer stores the digital music data on a hard disk. It would have

been obvious to one of ordinary skill in the art at the time the invention was made for the host

computer storage means of Akashi and the personal computer storage means of Akashi to be a

hard drives, because of the vast speed and because general computer configurations employ disk-

based storage systems such as hard disk as taught in Ohta (Col. 1, lines 21-26), which meets the

limitation of a first party control unit having a first party hard disk having a plurality of digital

video or digital audio signals which include desired digital video or digital audio signals and the

second party control unit includes a second party hard disk that stores a plurality of digital video

or audio signals, the first party hard disk connected to the first party control integrated circuit, the

second party hard disk is connected to the second party control integrated circuit. Akashi

discloses that the telecommunication lines are telephone lines (Page 4, Paragraph 1). Akashi

discloses automated purchasing of the digital music is conducted between the host computer and

the user personal computer (Page 2 Section 4), and is further detailed on page 3, paragraph 6,

through Page 4, paragraph 1. Akashi does not detail how this automated purchasing procedure is

conducted between the host computer and the user personal computer. Freeny discloses a method

of electronically distributing and selling audio and video data by way of having the requesting

user transmit a consumer credit card number along with their request for the audio and video data

(Col. 13, lines 25-29). This step allows the owner of the data to approve the sale and charge the

sale to the consumer credit card number (Col. 13, lines 30-31), which meets the limitation of a

mechanism for electronically selling the desired digital video or digital audio signals of the first

party's hard disk. It would have been obvious to one of ordinary skill in the art at the time the

invention was made to have the requesting user's of Akashi transmit a consumer credit card

number along with their request for the digital data so that the source unit could approve and

charge the sale of the digital data to the consumer credit card because this method of electronic

sale allows the owner of the information to receive directly the compensation for sale of

recording and such compensation is received before the reproduction is authorized as taught in

Freeny (Col. 13, lines 36-39). The source unit of Gallagher discloses having a buffer store RAM

(Figures 1-2) between the transmitter and the storage means. It would have been obvious to one

of ordinary skill in the art at the time the invention was made to include RAM in the host computer of Akashi in order to speed up the transmission process by allowing the transmitter to access data in RAM as opposed to a permanent storage device which is significantly slower, which meets the limitation of a sales random access memory chip electronically connected to the first party hard disk for storing a replica of the desired digital video or digital audio signals of the first party's disk to be transferred from the first party control unit, transferring from the sales random access memory chip to the second memory of the second party the desired digital video or digital audio signals of the first party's hard disk, the first party sales random access memory is connected to the first party control integrated circuit. Akashi does not expressly disclose playing back the stored digital audio. Eggers discloses a system for the playback of audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets the limitation of a mechanism for playing the desired digital video or digital audio signals connected to the second memory and the second party control panel, said playing mechanism operatively controlled by the second party control panel. It would have been obvious to one of ordinary skill in the art at the time the invention was made for the personal computer of Akashi to retrieve the digital music data from storage upon a user request in order for the user access a large amount of digital music data without having to utilize the traditional equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col. 15, line 5). Eggers does not disclose that the personal computers used for playback contain a playback RAM. Thomas discloses an audio and video playback

workstation computer that contains a processor, hard drive, monitor, audio output device, video playback memory, and audio playback memory (Col. 19, lines 36-50), which meets the limitation of a playback random access memory chip electronically connected to the second party hard disk for storing a replica of the desired digital video or audio signals as a temporary staging area for playback and is connected to the second party control integrated circuit. It would have been obvious to one of ordinary skill in the art at the time the invention was made to include an additional RAM in the personal computers of Eggers for playback purposes in order to reduce the amount of space taken up in system RAM by playback, which would allow more RAM space for resident programs.

44.     Claim 18 is rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi, "Automated Music Purchasing System", in view of Ohta, U.S. Patent No. 4,896,237, in view of Freeny, U.S. Patent No. 4,528,643, in view of Gallagher, in view of Eggers, U.S. Patent No. 4,920,432, in view of Thomas, U.S. Patent No. 4,739,398, as applied to claims 16-17 and further in view of Chace, U.S. Patent No. 4,792,974. Referring to claim 18, Akashi discloses that the personal computer of the user contains a monitor (Page 4, Paragraph 1), which meets the limitation of a monitor in electrical communication with said second control integrated circuit Eggers discloses that the personal computer has a monitor for video output/playback (Col. 4, lines 54) but does not expressly disclose the form for the audio output/playback. Chace discloses a system for audiovisual playback using a personal computer (Col. 5, lines 64-65) wherein the audio output comprises stereo speakers (Col. 7, line 39), which meets the limitation of speakers in possession and control of the second party and in electrical communication with said second control integrated circuit. It would have been obvious to one of ordinary skill in the art at the

time the invention was made to use stereo speakers as the audio output in the playback system of
Eggers in order to provide a more realistic and more pleasing sound to the ear as taught in Chace
(Col. 1, lines 32-33).

45.     Claims 19, 22-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,
"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view
of Ohta, U.S. Patent No. 4,896,237, in view of Gallagher, in view of Eggers, U.S. Patent No.
4,920,432, in view of Thomas, U.S. Patent No. 4,739,398. Referring to claims 19, 22-25, Akashi
discloses a system for automatically selling recorded music via telecommunication lines using a
personal computer (Page 1 through line 1 of Page 2 & Page 3, lines 3-5). Akashi does not
disclose that the digital data is video data. Freeny discloses a method of electronically
distributing and selling audio and video data by way of having the requesting user transmit a
consumer credit card number along with their request for the audio and video data (Col. 13, lines
25-29). It would have been obvious to one of ordinary skill in the art at the time the invention
was made to distribute video data using the system of Akashi because distributors of video data
would benefit from the cost reduction that would occur when eliminating manufacturing
facilities for reproducing the information in material objects and a distribution network for
distributing the material objects to the various points of sale locations for sale to the consumer as
taught in Freeny (Col. 1, lines 10-26). Akashi discloses that personal computer contains a CPU
(Figure 1). The personal computer sends an access signal to the host computer, and the host
computer returns a response signal that contains menu data displayed at the personal computer
(Page 3 Paragraph 6). Using the monitor screen, the user chooses desired data using a control
unit and sending the selection data to the host computer in the same way the initial transmission

was sent (Page 4 Paragraph 1), which meets the limitation of a first party control unit in

possession and control of a first party, a second party control unit possession and control of the

second party, wherein said second party control unit is at a location remote from said first party

control unit, a second party control unit having a second party control panel, a receiver and a

video display for playing the desired digital video signals received by the receiver, said second

party control panel connected to the video display and the receiver, said receiver and video

display operatively controlled by the second party control panel, said second party control unit

remote from the first party control unit, said second party control unit placed by the second party

at a second party location determined by the second party which is remote from said first party

control unit, a video display unit. When the desired data has been found, the host computer

transmits it to the personal computer where it is stored on the computer RAM (Page 4 Paragraph

1), which meets the limitation of said first party control unit having a first memory having a

plurality of desired individual video selections as desired digital video signals, said second party

control unit includes a second memory which is connected to the receiver and the video display,

said second memory storing the desired digital video signals that are received by the receiver to

provide the video display with the desired digital video signals from the first party memory,

telecommunications lines connected to the first party control unit and the second party control

unit through which the desired digital video signals are electronically transferred from the first

party memory to the receiver while the second party control unit is in possession and control of

the second party after the desired digital video signals the desired digital video signals are sold to

the second party by the first party, the first party control unit includes a first party control

integrated circuit which controls and executes commands of the first party and in connected to

the second party control integrated circuit through telecommunications lines, said first party

control integrated circuit and said second party control integrated circuit regulate the transfer of

the desired digital video signals, and a first party control panel through which the first party

control integrated circuit is programmed and is sent commands and which is connected to the

first party control integrated circuit, second party control panel through which the second party

control integrated circuit is programmed and is sent commands and which is connected to the

second party integrated circuit, the second party control unit includes an incoming random access

memory chip connected to the second party control integrated circuit, and the first party control

unit through the telecommunications lines for temporarily storing the desired digital video

signals received from the first party's control unit for subsequent storage to the second party.

Akashi discloses that the telecommunication lines are telephone lines (Page 4, Paragraph 1).

Gallagher discloses that the host computer storage means is a hard disk (Col. 1, lines 13-18, 32-

33), which is not expressly disclosed in Akashi. Akashi also does not disclose that the personal

computer stores the digital music data on a hard disk. It would have been obvious to one of

ordinary skill in the art at the time the invention was made for the host computer storage means

of Akashi and the personal computer storage means of Akashi to be a hard drives, because of the

vast speed and because general computer configurations employ disk-based storage systems such

as hard disk as taught in Ohta (Col. 1, lines 21-26), which meets the limitation of first party

control unit which includes a first party hard disk having the plurality of digital video signals

which include desired digital video signals and is connected to the first party control integrated

circuit, said second party choosing the desired digital video signals from the first party's hard

disk with said second party control panel, the second party control unit includes a second party

hard disk which stores a plurality of digital video signals and is connected to the second party control integrated circuit that controls and executes commands of the second party. Akashi discloses automated purchasing of the digital music is conducted between the host computer and the user personal computer (Page 2 Section 4), and is further detailed on page 3, paragraph 6, through Page 4, paragraph 1. Akashi does not detail how this automated purchasing procedure is conducted between the host computer and the user personal computer. Freeny discloses a method of electronically distributing and selling audio and video data by way of having the requesting user transmit a consumer credit card number along with their request for the audio and video data (Col. 13, lines 25-29). This step allows the owner of the data to approve the sale and charge the sale to the consumer credit card number (Col. 13, lines 30-31), which meets the limitation of means or a mechanism for the first party to charge a fee to the second party for access to the desired digital video signals of the first party's hard disk at a location remote from the second party location. It would have been obvious to one of ordinary skill in the art at the time the invention was made to have the requesting user's of Akashi transmit a consumer credit card number along with their request for the digital data so that the source unit could approve and charge the sale of the digital data to the consumer credit card because this method of electronic sale allows the owner of the information to receive directly the compensation for sale of recording and such compensation is received before the reproduction is authorized as taught in Freeny (Col. 13, lines 36-39). The source unit of Gallagher discloses having a buffer store RAM (Figures 1-2) between the transmitter and the storage means. It would have been obvious to one of ordinary skill in the art at the time the invention was made to include RAM in the host computer of Akashi in order to speed up the transmission process by allowing the transmitter to

access data in RAM as opposed to a permanent storage device which is significantly slower, which meets the limitation of a sales random access memory chip electronically connected to the first party hard disk for storing a replica of the desired digital video signals of the first party's hard disk to be transferred from the first party control unit. Akashi does not expressly disclose playing back the stored digital audio. Eggers discloses a system for the playback of audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5). It would have been obvious to one of ordinary skill in the art at the time the invention was made for the personal computer of Akashi to retrieve the digital music data from storage upon a user request in order for the user access a large amount of digital music data without having to utilize the traditional equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col. 15, line 5). Eggers does not disclose that the personal computers used for playback contain a playback RAM. Thomas discloses an audio and video playback workstation computer that contains a processor, hard drive, monitor, audio output device, video playback memory, and audio playback memory (Col. 19, lines 36-50), which meets the limitation of a playback random access memory chip electronically connected to the second party hard disk for storing a replica of the desired digital video signals as a temporary staging area for playback and is connected to the second control integrated circuit and the video display (discussed above in Akashi). It would have been obvious to one of ordinary skill in the art at the time the invention was made to include an additional RAM in the personal computers of Eggers for playback purposes in order to reduce the amount

Application/Control Number: 90/007,403
Art Unit: 2132

Page 44

of space taken up in system RAM by playback, which would allow more RAM space for resident programs.

### *Conclusion*

46.   **THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire **two months** from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination proceedings**. The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding.  Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR 1.550(c).**  A request for extension of time must be filed on or before the day on which a response to this action is due, and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g). The mere filing of a request will not effect any extension of time.  An extension of time will be granted only for sufficient cause, and for a reasonable time specified.

47.   The filing of a timely first response to this final rejection will be construed as including a request to extend the shortened statutory period for an additional month, which will be granted even if previous extensions have been granted.  In no event however, will the statutory period for response expire later than SIX MONTHS from the mailing date of the final action.  See MPEP § 2265.

48.   The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Application/Control Number: 90/007,403

Art Unit: 2132

Page 45

Patent No. 5,966,440 throughout the course of this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

49.     Any inquiry concerning this communication or earlier communications from the examiner should be directed to Benjamin E. Lanier whose telephone number is 571-272-3805. The examiner can normally be reached on M-Th 7:30am-5:00pm, F 7:30am-4pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Gilberto Barron can be reached on 571-272-3799.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Benjamin E. Lanier

GILBERTO BARRON JR.
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2100

Patentability
Con Feree:
Kim Vu

PINCHUS M. LAUFER, PH.D, J.D.   - Procedural matters only
SPECIAL PROGRAM EXAMINER
TECHNOLOGY CENTER 2100