# EXHIBIT C



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,407 | 01/31/2005 | 5966440 | NAPSP003 | 4782 |

23973      7590      03/27/2006

DRINKER BIDDLE & REATH
ATTN: INTELLECTUAL PROPERTY GROUP
ONE LOGAN SQUARE
18TH AND CHERRY STREETS
PHILADELPHIA, PA  19103-6996

| EXAMINER |
|---|

| ART UNIT | PAPER NUMBER |
|---|---|

DATE MAILED: 03/27/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Albert S. Penilla
MARTINE PENILLA & GENCARELLA, LLP
710 Lakeway Drive, Suite 200
Sunnyvale, CA 94085

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,407*

PATENT NO. *5966440*

ART UNIT *2132*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/007,407 | Patent Under Reexamination<br>5966440 | |
|---|---|---|---|
| | Examiner<br>Benjamin E. Lanier. | Art Unit<br>2132 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on *06 February 2006* .     b☒ This action is made FINAL.
c☐  A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I     THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.      3. ☐  Interview Summary, PTO-474.
2. ☐  Information Disclosure Statement, PTO-1449.            4. ☐  _____.

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-79* are subject to reexamination.

1b. ☐  Claims _____ are not subject to reexamination.

2.  ☒ Claims *2,3,22,37,38,41,43,44,62 and 63* have been canceled in the present reexamination proceeding.

3.  ☒ Claims *69-71 and 77-79* are patentable and/or confirmed.

4.  ☒ Claims *1,4-21,23-36,39,40,42,45-61,64 and 72* are rejected.

5.  ☒ Claims *65-68 and 73-76* are objected to.

6.  ☒ The drawings, filed on *10 December 1998* are acceptable.

7.  ☐  The proposed drawing correction, filed on _____ has been  (7a)☐  approved (7b)☐  disapproved.

8.  ☐  Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

     a)☐ All  b)☐ Some*  c)☐ None      of the certified copies have

     1☐ been received.

     2☐ not been received.

     3☐ been filed in Application No. _____ .

     4☐ been filed in reexamination Control No. _____.

     5☐ been received by the International Bureau in PCT application No. _____.

     * See the attached detailed Office action for a list of the certified copies not received.

9.  ☐  Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
       matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D.
       11, 453 O.G. 213.

10. ☐  Other: _____

cc: Requester (if third party requester)

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/007,407 | | Patent Under Reexamination<br>5966440 | |
|---|---|---|---|---|
| | Examiner<br>Benjamin E. Lanier | | Art Unit<br>2132 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on <u>06 February 2006</u> .   b☒ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire _____ month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.   3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO-1449.   4. ☐ _____.

Part II   SUMMARY OF ACTION

1a. ☒ Claims <u>1,4-21,23-36,39,40,42,45-61 and 64-79</u> are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☒ Claims <u>2,3,22,37,38,41,43,44,62 and 63</u> have been canceled in the present reexamination proceeding.

3. ☒ Claims <u>69-71 and 77-79</u> are patentable and/or confirmed.

4. ☒ Claims <u>1,4-21,23-36,39,40,42,45-61,64 and 72</u> are rejected.

5. ☒ Claims <u>65-68 and 73-76</u> are objected to.

6. ☒ The drawings, filed on <u>10 December 1998</u> are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All b)☐ Some* c)☐ None    of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____.

   5☐ been received by the International Bureau in PCT application No. _____.

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
   matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D.
   11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number: 90/007,407                                    Page 2

Art Unit: 2132

## DETAILED ACTION

### *Response to Amendment*

1.      Applicant's amendment filed 06 February 2006 adds claims 64-79. Applicant's

amendment has been fully considered and is entered.

### *Response to Arguments*

2.      Applicant's arguments filed 06 February 2006 have been fully considered but they are not

persuasive. Applicant's argument that obviousness-type double-patenting is not a new issue

related to patentability and is therefore inappropriate is not persuasive because double patenting

can provide a basis for a reexamination proceeding. *In re Lonardo*, 119 F.3d 960 (Fed. Cir.

1997); MPEP 2217, 2258. In Lonardo, the Federal Circuit reviewed and interpreted the language

of 35 U.S.C. 303 and stated that:

> Since the statute in other places refers to prior art in relation to reexamination, see id.,
>
> it seems apparent that Congress intended that the phrases patents and publications'
>
> and other patents or printed publications' in section 303(a) not be limited to prior art
>
> patents or printed publications... . Finally, it is reasonable to conclude that Congress
>
> intended to include double patenting over a prior patent as a basis for reexamination
>
> because maintenance of a patent that creates double patenting is as much of an
>
> imposition on the public as maintenance of patent that is unpatentable over prior art.
>
> Thus, we conclude that the PTO was authorized during reexamination to consider the
>
> question of double patenting based upon the `762 patent.

3.      *In re Lonardo*, 119 F.3d at 966, 43 USPQ2d at 1266. Accordingly, the issue of double

patenting is appropriate for consideration in reexamination, both as a basis for ordering

Application/Control Number: 90/007,407                                    Page 3

Art Unit: 2132

reexamination and during subsequent examination on the merits. The issue of double patenting is

to be considered by the examiner when making the decision on the request for reexamination.

The examiner should determine whether the issue of double patenting raises a substantial new

question of patentability. The issue of double patenting is also to be considered during the

examination stage of reexamination proceeding. In the examination stage, the examiner should

determine whether a rejection based on double patenting is appropriate.

4.      Applicant's arguments that the Examiner for the patent applications in question was

asked to consider the possibility of double patenting rejections on the co-pending applications

and therefore cannot be considered "substantial new question of patentability" is not persuasive

because since the application were copending, the corresponding claims could have been at

various stages of amendments. Therefore, it is impossible to determine at what state the

Examiner considered the claims for a potential double patenting rejection and therefore a

substantial new question of patentability exists.

5.      Applicant's argument that the obviousness-type double-patenting rejection relies own the

patent disclosure is not persuasive because the Examiner was stating that the control unit would

have been an inherent feature of the claimed invention. If not for some sort of control unit, then

the devices relied upon to perform the claimed functionality would be non-operable.

6.      In response to applicant's argument that the examiner has combined an excessive number

of references, reliance on a large number of references in a rejection does not, without more,

weigh against the obviousness of the claimed invention. See *In re Gorman*, 933 F.2d 982, 18

USPQ2d 1885 (Fed. Cir. 1991).

7.      In response to Applicant's arguments with respect to the Freeny reference, the District

Court considered the Freeny reference, in the analysis on pages 52-53, with respect to

anticipation and obviousness in view of only the teachings within the Freeny reference. Nowhere

does the court decision discuss a combination of Akashi and Freeny, as applied in this

reexamination proceeding, as being non-obvious.

8.      The Examiner disagrees with Applicant's assessment of Akashi as a simple inexpensive

digital audio tape recorder because Akashi clearly shows that the user device that communicates

with the host computer is a personal computer (paragraph 4). The recording device that

Applicant is referring to is a device/module of the personal computer; much the same as a hard

drive or a CD-ROM drive is a device/module of a personal computer.

9.      In response to applicant's argument that Freeny is nonanalogous art, it has been held that

a prior art reference must either be in the field of applicant's endeavor or, if not, then be

reasonably pertinent to the particular problem with which the applicant was concerned, in order

to be relied upon as a basis for rejection of the claimed invention. See *In re Oetiker*, 977

F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992). In this case, Akashi and Freeny both deal with

music purchasing over telecommunication lines that enable users access to requested music (See

Akashi page 1 and Freeny Col. 5, line 1 – Col. 6, line 23 & Col. 13, lines 27-31).

10.     Applicant argues that the proposed modification of Akashi, in view of Freeny, would

change the principle operation of the Akashi is not persuasive because the test for obviousness is

not whether the features of a secondary reference may be bodily incorporated into the structure

of the primary reference; nor is it that the claimed invention must be expressly suggested in any

one or all of the references. Rather, the test is what the combined teachings of the references

Application/Control Number: 90/007,407                                    Page 5
Art Unit: 2132

would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208

USPQ 871 (CCPA 1981). The proposed modification to the automated purchasing component of

Akashi, which isn't even described in the Akashi reference, would not change the principle

operation of the Akashi reference.  Akashi discloses that the digital music data is purchased

automatically but does not expressly detail how the purchase is transacted. Freeny discloses a

method of electronically distributing and selling audio and video data by way of having the

requesting user transmit a consumer credit card number along with their request for the audio

and video data (Col. 13, lines 25-29). This step allows the owner of the data to approve the sale

and charge the sale to the consumer credit card number (Col. 13, lines 30-31). It would have

been obvious to one of ordinary skill in the art at the time the invention was made to have the

requesting user's of Akashi transmit a consumer credit card number along with their request for

the digital data so that the source unit could approve and charge the sale of the digital data to the

consumer credit card because this method of electronic sale allows the owner of the information

to receive directly the compensation for sale of recording and such compensation is received

before the reproduction is authorized as taught in Freeny (Col. 13, lines 36-39). The subsequent

transmission of data in Akashi has not been modified, and therefore, suggesting that the

modification of the purchasing component of Akashi would change the principle operation of

Akashi is simply not true.

11.    Applicant's argument that the motivation for the proposed modification of the purchasing

component of Akashi with the electronic sales procedure of Freeny is a conclusory statement is

not persuasive because the motivation is not a conclusory statement but instead is teaching

directly from the Freeny reference. See motivation below:

It would have been obvious to one of ordinary skill in the art at the time the invention

was made to have the requesting user's of Akashi transmit a consumer credit card number

along with their request for the digital data so that the source unit could approve and

charge the sale of the digital data to the consumer credit card because this method of

electronic sale allows the owner of the information to receive directly the compensation

for sale of recording and such compensation is received before the reproduction is

authorized as taught in Freeny (Col. 13, lines 36-39).

This teaching in Freeny would lead one of ordinary skill in the art at the time the

invention was made to perform an electronic sale using credit card information so that the seller

could receive direct compensation.

12.     In response to Applicant's argument that no showing of a reasonable expectation of

success has been made, the incorporation of the electronic payment steps of Freeny into the

automated purchasing system of Akashi allow for a seller to receive direct compensation for the

data that the automated purchasing system of Akashi allows to be sold.

13.     Applicant's argument that the combination of Akashi and Freeny do not suggest that

transmission of audio or video information from a remote location can be triggered by providing

credit card account information is not persuasive because taking into account the above-

mentioned modification of Akashi using the electronic payment steps of Freeny, the user's

request for the data from the host computer of Akashi would be accompanied with the user's

credit card information. At the remote cite, access to the data would be allowed once the credit

card information is authorized (See Freeny Col. 13, lines 27-39). In Akashi the access provided

to the user is done through telecommunication lines (i.e. data being transmitted from the host

Application/Control Number: 90/007,407                                              Page 7

Art Unit: 2132

computer to the user's personal computer over telecommunication lines)(See Akashi Page 1

through line 1 of Page 2 & Page 3, lines 3-5 & Page 4 paragraph 1).

14.     Applicant's argument that modifying the host computer of Akashi to include a hard drive

to store the data files does not take into account the purpose of the system of Akashi is not

persuasive because modifying the host computer has nothing to do with the recording phase of

the Akashi system. Furthermore, modifying the user personal computer with a hard drive would

not be contrary to the purpose of the system of Akashi because if the user of the personal

computer intended to have a portable copy of the requested data, a hard drive on the user

personal computer would not hinder the recording process. Modifying the user's personal

computer with a hard drive would merely give the personal computer a larger and faster storage

medium (Ohta, Col. 1, lines 21-25, 38-42) for storage of the requested files before the recording

device would record them.

15.     Applicant arguments with respect to various elements of Freeny are not persuasive

because the test for obviousness is not whether the features of a secondary reference may be

bodily incorporated into the structure of the primary reference; nor is it that the claimed

invention must be expressly suggested in any one or all of the references.  Rather, the test is what

the combined teachings of the references would have suggested to those of ordinary skill in the

art.  See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

16.     Applicant's arguments with respect to the hard drive of Gallagher is not persuasive

because the teachings of Gallagher show it would have been obvious for the host computer of

Akashi to have a hard drive. The source unit of Gallagher would be analogous to the host

computer of Akashi. The teachings of Ohta show that it would have been obvious to one of

ordinary skill in the art at the time the invention was made for the user's personal computer to

have a hard drive for the various reasons stated in Ohta. The test for obviousness is not whether

the features of a secondary reference may be bodily incorporated into the structure of the primary

reference; nor is it that the claimed invention must be expressly suggested in any one or all of the

references. Rather, the test is what the combined teachings of the references would have

suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871

(CCPA 1981).

17.     Applicant's argument that no prior art reference has been cited to show the recording of

audio or video information is not persuasive because, as stated on page 19 of the remarks,

Gallagher discloses that the source unit, which stores the audio data, stores the data on a hard

drive. The motivation to modify the Akashi reference was given as follows:

> It would have been obvious to one of ordinary skill in the art at the time the invention
>
> was made for the host computer storage means of Akashi and the personal computer
>
> storage means of Akashi to be a hard drives, because of the vast speed and because
>
> general computer configurations employ disk-based storage systems such as hard disk as
>
> taught in Ohta (Col. 1, lines 21-26).

18.     In response to applicant's argument that the examiner's conclusion of obviousness is

based upon improper hindsight reasoning, it must be recognized that any judgment on

obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning. But so

long as it takes into account only knowledge which was within the level of ordinary skill at the

time the claimed invention was made, and does not include knowledge gleaned only from the

applicant's disclosure, such a reconstruction is proper. See *In re McLaughlin*, 443 F.2d 1392,

170 USPQ 209 (CCPA 1971). Therefore, because the knowledge used for the conclusion of

obviousness comes directly from the cited prior art, the reconstruction is proper.

19.     Applicant's argument that none of the prior art references cite playing of audio

information as it is sent from a central location is not persuasive because it is not a claimed

limitation. Applicant claims playing the audio information once it is stored on the user computer.

20.     Applicant's argument that the Eggers reference does not disclose permanent copying of

video information is not persuasive because one cannot show nonobviousness by attacking

references individually where the rejections are based on combinations of references.  See *In re*

*Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800 F.2d 1091, 231

USPQ 375 (Fed. Cir. 1986).

21.     Applicant contends that the playback features of Eggers cannot be modified to the

technology of Akashi because the system of Eggers uses immediate playback. This assessment is

improper because the personal computers of Eggers have hard drives (Eggers, Col. 7, line 65),

and Eggers discloses that the data transferred between the central device and the user's personal

computer is stored in the hard drive of the personal computer (Col. 8, lines 1-3). Therefore, the

hard drive of the personal computer is an integral part of the playback process of Eggers.

Therefore, the motivation to combine has come fully from the cited prior art and not from

Applicant's disclosure.

22.     In response to applicant's argument that Thomas is completely silent with respect to

producing copies from recorded audio or video information in the form of a tape or optical disk

and playing of audio or video information from a central library in response to a request, the test

for obviousness is not whether the features of a secondary reference may be bodily incorporated

into the structure of the primary reference; nor is it that the claimed invention must be expressly

suggested in any one or all of the references. Rather, the test is what the combined teachings of

the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642

F.2d 413, 208 USPQ 871 (CCPA 1981). Eggers does not disclose that the personal computers

used for playback contain a playback RAM. Thomas discloses an audio and video playback

workstation computer that contains a processor, hard drive, monitor, audio output device, video

playback memory, and audio playback memory (Col. 19, lines 36-50), which meets the

limitation of a transferring a replica of the desired digital video or digital audio signals from the

second party hard disk to the playback random access memory chip for playback and playing the

desired digital video or digital audio signals from the second party hard disk. It would have been

obvious to one of ordinary skill in the art at the time the invention was made to include an

additional RAM in the personal computers of Eggers for playback purposes in order to reduce

the amount of space taken up in system RAM by playback, which would allow more RAM space

for resident programs.

23.    In response to applicant's argument that Chace does not disclose the copying of audio or

video information and has nothing at all to do with the purchase or recording of video or audio

information, the test for obviousness is not whether the features of a secondary reference may be

bodily incorporated into the structure of the primary reference; nor is it that the claimed

invention must be expressly suggested in any one or all of the references. Rather, the test is what

the combined teachings of the references would have suggested to those of ordinary skill in the

art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981). Eggers discloses that the

personal computer has a monitor for video output/playback (Col. 4, lines 54) but does not

expressly disclose the form for the audio output/playback. Chace discloses a system for

audiovisual playback using a personal computer (Col. 5, lines 64-65) wherein the audio output

comprises stereo speakers (Col. 7, line 39), which meets the limitation of speakers in possession

and control of the second party and in electrical communication with said second control

integrated circuit. It would have been obvious to one of ordinary skill in the art at the time the

invention was made to use stereo speakers as the audio output in the playback system of Eggers

in order to provide a more realistic and more pleasing sound to the ear as taught in Chace (Col. 1,

lines 32-33).

24.     All of the Applicant's arguments with the respect to the 103 rejections represent attacks

on the references individually where the rejections are based on combinations of references and

they represent allegations that various features of the secondary references cannot be bodily

incorporated into the structure of the primary reference. These arguments cannot be relied upon

to show nonobviousness. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re*

*Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).

25.     Therefore, the cited prior art references were considered as a whole when making the

claim rejections and would have suggested to those of ordinary skill in the art the above-

mentioned combinations.

26.     Applicant's arguments with respect to commercial success are not persuasive because

commercial success may have been attributable to extensive advertising and position as a market

leader before the introduction of the patented product, Pentec, Inc. v. Graphic Controls Corp.,

776 F.2d 309, 227 USPQ 766 (Fed. Cir. 1985). The Napster name gained worldwide notoriety in

the late 1990's because of their software which allowed users to illegally download music. At its

height, Napster had 70 million unique users who were estimated to have traded over 3 billion

files a month (See Wired News "Napster is Alive, Alive", Page 3). This would have given

Napster's legitimate online music store a starting base of 70 million users who were familiar

with Napster products prior to their online music store's launch. Therefore, Applicant has failed

to show that the commercial success of the Napster Light software is due to the alleged use of

Applicant's claimed invention instead of being a direct result of Napster's prominent name with

respect to music downloading.

27.      Success of invention could be due to recent changes in related technology or consumer

demand, In re Fielder, 471 F.2d 690, 176 USPQ 300 (CCPA 1973). The existence and

profitability of the systems mentioned by Applicant are due to the advances in recent technology

and not Applicant's claimed invention. If the latter was responsible for the success, then it stands

to reason that the existence of a profitable system would have occurred earlier since Applicant's

first application directed to the claimed subject matter was filed in June of 1988. At the time of

Napster Light's ("Napster") launch, personal computer storage capacities were significantly

larger than they were at the time of the prior art systems. Hard drives routinely come in

capacities of 20 gigabytes or higher, whereas in 1988 the capacity was around 40 megabytes. Not

to mention the fact that when Napster was launched, audio file compression was advanced to the

point where a file could be compressed to a third of the size with little observable quality loss.

Add to that the proliferation of broadband Internet that simply did not exist at the time of prior

art systems and what you have is the ability to store a significantly larger amount of music

because of file size and storage capacity, and the ability to acquire this music much faster.

Therefore, Applicant cannot attribute the commercial success of Napster's system to the alleged

Application/Control Number: 90/007,407                                    Page 13
Art Unit: 2132

use of their claimed invention when there is no reason to suggest that any of the prior art

distribution system would not have been just as successful given these same advances in

technology.

28.     Applicant's arguments with respect to the newly added claims, against the cited prior are

persuasive. However, after search and consideration of the newly added claims, new grounds of

rejection are made in view of the previously references and in further view of Stokes. Some of

the newly added claimed subject matter has been indicated as allowable subject matter.

Accordingly, **THIS ACTION IS MADE FINAL.**

### *Double Patenting*

29.     The nonstatutory double patenting rejection is based on a judicially created doctrine
grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or
improper timewise extension of the "right to exclude" granted by a patent and to prevent possible
harassment by multiple assignees. See *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.
Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686
F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA
1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).
        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) may be used to
overcome an actual or provisional rejection based on a nonstatutory double patenting ground
provided the conflicting application or patent is shown to be commonly owned with this
application. See 37 CFR 1.130(b).
        Effective January 1, 1994, a registered attorney or agent of record may sign a terminal
disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37
CFR 3.73(b).

30.     Claims 1, 4-21, 23-36, 39, 40, 42, 45-61 are rejected under the judicially created doctrine

of obviousness-type double patenting as being unpatentable over claims 1-34 of U.S. Patent No.

5,675,734. Although the conflicting claims are not identical, they are not patentably distinct

from each other because the current claims and claims 1-34 of the '734 patent essentially claim

the same invention of a method/system for distributing digital audio or digital video signals to a

second party having a control unit, an integrated circuit, a control panel, an incoming memory

for receiving the digital audio or digital video signals, a hard disk for storage of the digital audio

or digital video signals subsequent the their reception at the incoming memory, a playback

memory for storing the digital audio or digital video prior to playback , but after storage at the

hard drive. The second party receives the digital audio or digital video from a first party having a

control unit, an integrated circuit, a control panel, hard disk for storing digital audio or digital

video, a sales random access memory for temporarily storing the digital audio or digital video

from the hard disk, prior to distribution. The digital audio or digital video signals are distributed

through telecommunications lines between the sales memory of the first party and the incoming

memory of the second party. Prior to distribution, the digital audio or digital video signals are

electronically sold to the second party by the first party by providing a connection between the

two parties and providing a credit card number of the second party by the second party to the

first party, and charging a fee for the digital audio or digital video by the first party to the

provided credit card account of the second party. Prior to distribution, electronically coding the

digital audio or digital video in order to prevent unauthorized reproduction of the digital audio or

digital video signals. The purchase being initiated by the second party control panel and second

party integrated circuit. For example, current claims 1 and 4 are not patentable distinct from

claims 1, 3, 14, and 16 of the '734 patent because claim 1 of the '734 patent includes: forming a

connection through telecommunications lines between a first memory of a first party and a

second memory of a second party control unit of a second party, said first memory having said

desired digital video or digital audio signals. Claim 1 of the '734 patent also includes:

transferring the desired digital video or digital audio signals from the first memory of the first

party to the second memory of the second party control unit of the second party through

telecommunications lines while the second party control unit with the second memory is in

possession and control of the second part. Claims 3 and 14 of the '734 patent include: playing the

digital video or digital audio signals through speakers of the second party control unit the digital

video or digital audio signals in the second memory, said speakers of the second party control

unit connected with the second memory of the second party control unit. Claims 1 and 16 of the

'734 patent include: selling electronically by the first party to the second party through

telecommunications lines, the desired digital video or digital audio signals in the first memory,

the second party is at a second party location and the step of selling electronically includes the

step of charging a fee via telecommunications lines by the first party to the second party at a first

party location remote from the second party location, the second party has an account and the

step of charging a fee includes the step of charging the account of the second party.

31.      Claims 1, 4-21, 23-36, 39, 40, 42, 45-61 are rejected under the judicially created doctrine

of obviousness-type double patenting as being unpatentable over claims 1-6 of U.S. Patent No.

5,191,573. Although the conflicting claims are not identical, they are not patentably distinct

from each other because claim 1 of the '573 patent recites a method for transmitting a digital

audio signals stored on a first memory of a first party to a second memory of a second party. As

claimed, the first party is at a location that is remote from the second memory and the second

party is distinct from the first party. The method comprises the step of transferring money to the

first party from the second party, connecting the first and second memories electronically,

transmitting the digital audio signal from the first memory to the second memory, and storing the

digital audio signal in the second memory. Claim 4 of the '573 patent provides a method similar

to the above mentioned with respect to digital video signals. The only differences between the

claims is the recitation of a "second party control unit", in current claim 1, which would have

been obvious to one of ordinary skill in the art at the time the invention was made in light of

specification for the '573 patent where the second party is shown to have a control unit ('573,

Col. 3, lines 52-56).

### *Claim Rejections - 35 USC § 103*

32.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

33.     The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966), that are applied for establishing a background for determining obviousness under 35

U.S.C. 103(a) are summarized as follows:

1.      Determining the scope and contents of the prior art.
2.      Ascertaining the differences between the prior art and the claims at issue.
3.      Resolving the level of ordinary skill in the pertinent art.
4.      Considering objective evidence present in the application indicating obviousness
        or nonobviousness.

34.     Claims 47, 48 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643. Referring

to claim 47, Akashi discloses a system for automatically selling recorded music via

telecommunication lines using a personal computer (Page 1 through line 1 of Page 2 & Page 3,

lines 3-5). Akashi discloses that personal computer contains a CPU (Figure 1). The personal

computer sends an access signal to the host computer, and the host computer returns a response

signal that contains menu data displayed at the personal computer (Page 3 Paragraph 6). Using

the monitor screen, the user chooses desired data using a control unit and sending the selection

data to the host computer in the same way the initial transmission was sent (Page 4 Paragraph 1),

which meets the limitation of a first party control unit having a first memory having a plurality of

desired individual selections as selections as described digital signals, a second party control unit

having a second party control panel, a receiver and a video display for playing the desired the

desired digital signals received by the receiver, said second party control panel connected to the

video display and the receiver, said receiver and video display operatively controlled by the

second party control panel, said second party control unit remote from the first party control unit,

said second party control unit placed by the second party at a second party location determined

by the second party which is remote from said first party control unit, said second party choosing

the desired digital video signals from the first memory with said second party control panel.

When the desired data has been found, the host computer transmits it to the personal computer

where it is stored on the computer RAM (Page 4 Paragraph 1), which meets the limitation of

telecommunications lines connected to the first party control unit and the second party control

unit through which the desired digital signals are electronically transferred from the first memory

to the receiver while the second party control unit is in possession and control of the second

party after the desired digital signals are sold to the second party by the first party, the second

party control unit includes a second memory which is connected to the receiver and the video

display, said second memory storing the digital signals that are received by the receiver to

provide the video display with the digital signals. Akashi does not disclose that the digital data is

video data. Freeny discloses a method of electronically distributing and selling audio and video

data by way of having the requesting user transmit a consumer credit card number along with

their request for the audio and video data (Col. 13, lines 25-29). It would have been obvious to

one of ordinary skill in the art at the time the invention was made to distribute video data using

the system of Akashi because distributors of video data would benefit from the cost reduction

that would occur when eliminating manufacturing facilities for reproducing the information in

material objects and a distribution network for distributing the material objects to the various

points of sale locations for sale to the consumer as taught in Freeny (Col. 1, lines 10-26). Akashi

discloses automated purchasing of the digital music is conducted between the host computer and

the user personal computer (Page 2 Section 4), and is further detailed on page 3, paragraph 6,

through Page 4, paragraph 1. Akashi does not detail how this automated purchasing procedure is

conducted between the host computer and the user personal computer. Freeny discloses a method

of electronically distributing and selling audio and video data by way of having the requesting

user transmit a consumer credit card number along with their request for the audio and video data

(Col. 13, lines 25-29). This step allows the owner of the data to approve the sale and charge the

sale to the consumer credit card number (Col. 13, lines 30-31), which meets the limitation of

means or a mechanism for the first party to charge a fee to the second party for access to the

desired digital video signals at a location remote from the second party location, the second party

has an account and the means or mechanism for charging a fee includes means or a mechanism

for charging the account of the second party, charging the account includes means or mechanism

for charging a credit card number of the second party. It would have been obvious to one of

ordinary skill in the art at the time the invention was made to have the requesting user's of

Akashi transmit a consumer credit card number along with their request for the digital data so

that the source unit could approve and charge the sale of the digital data to the consumer credit

card because this method of electronic sale allows the owner of the information to receive

directly the compensation for sale of recording and such compensation is received before the

reproduction is authorized as taught in Freeny (Col. 13, lines 36-39).

35.     Claim 49 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, as

applied to claims 47, 48, and in view of Gallagher, in view of Ohta, U.S. Patent No. 4,896,237.

Referring to claim 49, Gallagher discloses that the host computer storage means is a hard disk

(Col. 1, lines 13-18, 32-33), which is not expressly disclosed in Akashi. Akashi also does not

disclose that the personal computer stores the digital music data on a hard disk. It would have

been obvious to one of ordinary skill in the art at the time the invention was made for the host

computer storage means of Akashi and the personal computer storage means of Akashi to be a

hard drives because of the vast speed and because general computer configurations employ disk-

based storage systems such as hard disk as taught in Ohta (Col. 1, lines 21-26). The source unit

of Gallagher discloses having a buffer store RAM (Figures 1-2) between the transmitter and the

storage means. It would have been obvious to one of ordinary skill in the art at the time the

invention was made to include RAM in the host computer of Akashi in order to speed up the

transmission process by allowing the transmitter to access data in RAM as opposed to a

permanent storage device which is significantly slower, which meets the limitation of a sales

random access memory. This meets the limitation of the first party control unit includes a first

party hard disk having a plurality of digital video signals which include the desired video signals,

and a sales random access memory chip electronically connected to the first party hard disk for

storing a replica of the desired digital video signals of the first party's hard disk.

36.    Claims 50-57 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Gallagher, in view of Ohta, U.S. Patent No. 4,896,237, as applied to claims 47-49, and further

in view of Eggers, U.S. Patent No. 4,920,432, in view of Thomas, U.S. Patent No. 4,739,398.

Referring to claims 50-57, Akashi also does not disclose that the personal computer stores the

digital music data on a hard disk. It would have been obvious to one of ordinary skill in the art at

the time the invention was made for the host computer storage means of Akashi and the personal

computer storage means of Akashi to be a hard drives because of the vast speed and because

general computer configurations employ disk-based storage systems such as hard disk as taught

in Ohta (Col. 1, lines 21-26), which meets the limitation of the second party control unit includes

a second party hard disk which stores a plurality of digital video signals. Akashi does not

expressly disclose that the personal computer that receives the digital music data plays the digital

music data back after it has been stored on the storage medium of the personal computer. Eggers

discloses a system for the playback of audio/video data wherein users operating a personal

computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32), requests a storage

device to retrieve a particular audio/video file (Col. 6, lines 8-15). The requested file is then

pulled from storage and sent to the requesting personal computer for playback (Col. 6, lines 16-

39 & Col. 7, lines 1-5), which meets the limitation of a mechanism for playing the digital video

signals stored in the second memory, said playing mechanism connected to the second memory.

It would have been obvious to one of ordinary skill in the art at the time the invention was made

for the personal computer of Akashi to retrieve the digital music data from storage upon a user

request in order for the user access a large amount of digital music data without having to utilize

the traditional equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col.

15, line 5). Eggers does not disclose that the personal computers used for playback contain a

playback RAM. Thomas discloses an audio and video playback workstation computer that

contains a processor, hard drive, monitor, audio output device, video playback memory, and

audio playback memory (Col. 19, lines 36-50), which meets the limitation of a playback random

access memory chip electronically connected to the second party hard disk for storing a replica

of the desired digital video signals as a temporary staging area for playback. It would have been

obvious to one of ordinary skill in the art at the time the invention was made to include an

additional RAM in the personal computers of Eggers for playback purposes in order to reduce

the amount of space taken up in system RAM by playback, which would allow more RAM space

for resident programs.

37.     Claims 11, 12, 19-21, 23, 24, 29-31, 36, 39, 40, 42, 45, 46 are rejected under 35 U.S.C.

103(a) as being unpatentable over Akashi, "Automated Music Purchasing System", in view of

Freeny, U.S. Patent No. 4,528,643, in view of Eggers, U.S. Patent No. 4,920,432. Referring to

claim 11, Akashi discloses a system for automatically selling recorded music via

telecommunication lines using a personal computer (Page 1 through line 1 of Page 2 & Page 3,

lines 3-5). Akashi discloses that personal computer contains a CPU (Figure 1), which meets the

limitation of placing a second party control unit in possession and control of the second party by

the second party at a desired location determined by the second party. The personal computer

sends an access signal to the host computer, and the host computer returns a response signal that

contains menu data displayed at the personal computer (Page 3 Paragraph 6). Using the monitor

screen, the user chooses desired data using a control unit and sending the selection data to the

host computer in the same way the initial transmission was sent (Page 4 Paragraph 1), which

meets the limitation of entering into a second party control panel of the second party control unit

of the second party commands by the second party to purchase desired digital video or digital

audio signals from a first party. When the desired data has been found, the host computer

transmits it to the personal computer where it is stored on the computer RAM (Page 4 Paragraph

1), which meets the limitation of forming a connection through telecommunications lines

between a first memory of the first party and a second memory of the second party control unit,

said first memory having desired digital video or digital audio signals, transferring the desired

digital video or digital audio signals from the first memory of the first party into the second

memory of the second party through telecommunications lines while the second memory is in

possession and control of the second party. Akashi discloses automated purchasing of the digital

music is conducted between the host computer and the user personal computer (Page 2 Section

4), and is further detailed on page 3, paragraph 6, through Page 4, paragraph 1. Akashi does not

detail how this automated purchasing procedure is conducted between the host computer and the

user personal computer. Freeny discloses a method of electronically distributing and selling

audio and video data by way of having the requesting user transmit a consumer credit card

number along with their request for the audio and video data (Col. 13, lines 25-29). This step

allows the owner of the data to approve the sale and charge the sale to the consumer credit card

number (Col. 13, lines 30-31), which meets the limitation of selling electronically by the first

party to the second party through telecommunications lines, the desired digital video or digital

audio signals in the first memory. It would have been obvious to one of ordinary skill in the art at

the time the invention was made to have the requesting user's of Akashi transmit a consumer

credit card number along with their request for the digital data so that the source unit could

approve and charge the sale of the digital data to the consumer credit card because this method of

electronic sale allows the owner of the information to receive directly the compensation for sale

of recording and such compensation is received before the reproduction is authorized as taught in

Freeny (Col. 13, lines 36-39). Akashi does not expressly disclose that the personal computer that

receives the digital music data plays the digital music data back after it has been stored on the

storage medium of the personal computer. Eggers discloses a system for the playback of

audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which

contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular

audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the

requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets

the limitation of entering into the second party control panel commands to play the desired

digital video or digital audio signals in the second memory of the second party control unit,

playing the desired digital video or digital audio signals with the second party control unit. It

would have been obvious to one of ordinary skill in the art at the time the invention was made

for the personal computer of Akashi to retrieve the digital music data from storage upon a user

request in order for the user access a large amount of digital music data without having to utilize

the traditional equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col.

15, line 5).

Referring to claims 12, 19-21, Akashi discloses a system for automatically selling

recorded music via telecommunication lines using a personal computer (Page 1 through line 1 of

Page 2 & Page 3, lines 3-5). This system utilizes the telecommunications lines to transmit the

recorded music data, stored on a host computer database (Page 3 Paragraph 4), from a host

computer that stores the recorded music data to a personal computer RAM (Page 2 Sections 4-5),

which meets the limitation of a first party control unit having a first memory having desired

digital video or digital audio signals, telecommunications lines connected to the first party

control unit and the second party control unit through which the electronic sales of the desired

digital video or digital audio signals occur and through which the desired digital video or digital

audio signals are electronically transferred from the first memory to the second memory while

the second memory is in possession and control of the second party after desired digital video or

digital audio signals are sold to the second party by the first party. Akashi discloses automated

purchasing of the digital music is conducted between the host computer and the user personal

computer (Page 2 Section 4), and is further detailed on page 3, paragraph 6, through Page 4,

paragraph 1. Akashi does not detail how this automated purchasing procedure is conducted

between the host computer and the user personal computer. Freeny discloses a method of

electronically distributing and selling audio and video data by way of having the requesting user

transmit a consumer credit card number along with their request for the audio and video data

(Col. 13, lines 25-29). This step allows the owner of the data to approve the sale and charge the

sale to the consumer credit card number (Col. 13, lines 30-31), which meets the limitation of

means or a mechanism for electronically selling the desired digital video or digital audio signals.

It would have been obvious to one of ordinary skill in the art at the time the invention was made

to have the requesting user's of Akashi transmit a consumer credit card number along with their

request for the digital data so that the source unit could approve and charge the sale of the digital

data to the consumer credit card because this method of electronic sale allows the owner of the

information to receive directly the compensation for sale of recording and such compensation is

received before the reproduction is authorized as taught in Freeny (Col. 13, lines 36-39). The

personal computer sends an access signal to the host computer, and the host computer returns a

response signal that contains menu data displayed at the personal computer (Page 3 Paragraph 6).

Using the monitor screen, the user chooses desired data using a control unit and sending the

selection data to the host computer in the same way the initial transmission was sent (Page 4

Paragraph 1. When the desired data has been found, the host computer transmits it to the

personal computer where it is stored on the computer RAM (Page 4 Paragraph 1), which meets

the limitation of a second party control unit having a second party control panel, a second

memory connected to the second party control panel, said second party control unit remote from

the first party control unit, said second party control placed by the second party at a location

determined by the second party. Akashi does not expressly disclose that the personal computer

that receives the digital music data plays the digital music data back after it has been stored on

the storage medium of the personal computer. Eggers discloses a system for the playback of

audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which

contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular

audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the

requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets

the limitation of means or a mechanism for playing the desired digital video or digital audio

signals connected to the second memory and the second party control panel, said playing means

or mechanism operatively controlled by the second party control panel. It would have been

obvious to one of ordinary skill in the art at the time the invention was made for the personal

computer of Akashi to retrieve the digital music data from storage upon a user request in order

for the user access a large amount of digital music data without having to utilize the traditional

equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col. 15, line 5).

Referring to claims 19-21, Akashi does not detail how this automated purchasing

procedure is conducted between the host computer and the user personal computer. Freeny

discloses a method of electronically distributing and selling audio and video data by way of

having the requesting user transmit a consumer credit card number along with their request for

the audio and video data (Col. 13, lines 25-29). This step allows the owner of the data to approve

the sale and charge the sale to the consumer credit card number (Col. 13, lines 30-31), which

meets the limitation of means or mechanism for electronically selling includes means or a

mechanism for electronically selling includes means or a mechanism for charging a fee via

telecommunications lines by the first party to the second party at a first party location remote

from the second party location, the second party has an account and the means or mechanism for

charging a fee includes means or a mechanism for charging the account of the second party, the

means or mechanism for charging the account includes means or a mechanism for receiving a

credit card number of the second party. It would have been obvious to one of ordinary skill in the

art at the time the invention was made to have the requesting user's of Akashi transmit a

consumer credit card number along with their request for the digital data so that the source unit

could approve and charge the sale of the digital data to the consumer credit card because this

method of electronic sale allows the owner of the information to receive directly the

compensation for sale of recording and such compensation is received before the reproduction is

authorized as taught in Freeny (Col. 13, lines 36-39).

Referring to claims 23, 24, 29-31, Akashi discloses a system for automatically billing

recorded music via telecommunication lines using a personal computer (Page 1 through line 1 of

Page 2 & Page 3, lines 3-5). The personal computer sends an access signal to the host computer,

and the host computer returns a response signal that contains menu data displayed at the personal

computer (Page 3 Paragraph 6), which meets the limitation of connecting means or mechanism

comprise a first control unit in possession and control of the first party and a second control unit

in possession and control of the second party. Using the monitor screen, the user chooses desired

data using a control unit and sending the selection data to the host computer in the same way the

initial transmission was sent (Page 4 Paragraph 1). When the desired data has been found, the

host computer transmits it to the personal computer where it is stored on the computer RAM

(Page 4 Paragraph 1), which meets the limitation of means of a mechanism for connecting

electronically via telecommunications lines the first memory with the second memory such that

the desired digital video or digital audio signals can pass there between, said connecting means

or mechanism in electrical communication with the transferring means or mechanism, means or a

mechanism for transmitting the desired digital video or digital audio signals from the first

memory with a transmitter in control and possession of the first party to a receiver having the

second memory while said receiver is in possession and control of the second party, said receiver

place at a location determined by the second party, said transmitting means or mechanism in

electrical communication with said connecting means or mechanism, means or a mechanism for

storing the digital video or digital audio signals in the second memory, said storing means or

mechanism in electrical communication with said transmitting means or mechanism. Akashi

discloses automated purchasing of the digital music is conducted between the host computer and

the user personal computer (Page 2 Section 4), and is further detailed on page 3, paragraph 6,

through Page 4, paragraph 1. Akashi does not detail how this automated purchasing procedure is

conducted between the host computer and the user personal computer. Freeny discloses a method

of electronically distributing and selling audio and video data by way of having the requesting

user transmit a consumer credit card number along with their request for the audio and video data

(Col. 13, lines 25-29). This step allows the owner of the data to approve the sale and charge the

sale to the consumer credit card number (Col. 13, lines 30-31), which meets the limitation of

means or a mechanism for transferring money electronically via telecommunications lines from

the second party to the first party controlling use of the first memory, at a location remote from

the second memory, said second party controlling use and in possession of the second memory,

means or mechanism for the first party to charge a fee includes means or a mechanism for

transferring money electronically via telecommunications lines to the first party at a location

remote from the second memory at the second location. It would have been obvious to one of

ordinary skill in the art at the time the invention was made to have the requesting user's of

Akashi transmit a consumer credit card number along with their request for the digital data so

that the source unit could approve and charge the sale of the digital data to the consumer credit

card because this method of electronic sale allows the owner of the information to receive

directly the compensation for sale of recording and such compensation is received before the

reproduction is authorized as taught in Freeny (Col. 13, lines 36-39). Akashi does not expressly

disclose that the personal computer that receives the digital music data plays the digital music

data back after it has been stored on the storage medium of the personal computer. Eggers

discloses a system for the playback of audio/video data wherein users operating a personal

computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32), requests a storage

device to retrieve a particular audio/video file (Col. 6, lines 8-15). The requested file is then

pulled from storage and sent to the requesting personal computer for playback (Col. 6, lines 16-

39 & Col. 7, lines 1-5), which meets the limitation of means or mechanism for playing the digital

video or digital audio signals stored in the second memory, said playing means or mechanism

connected to the second memory. It would have been obvious to one of ordinary skill in the art at

the time the invention was made for the personal computer of Akashi to retrieve the digital music

data from storage upon a user request in order for the user access a large amount of digital music

data without having to utilize the traditional equipment used to playback those files as taught in

Eggers (Col. 14, line 67 – Col. 15, line 5).

Referring to claims 36, 39, 40, 42, 45, 46, Akashi discloses a system for automatically

billing recorded music via telecommunication lines using a personal computer (Page 1 through

line 1 of Page 2 & Page 3, lines 3-5). The personal computer sends an access signal to the host

computer, and the host computer returns a response signal that contains menu data displayed at

the personal computer (Page 3 Paragraph 6), which meets the limitation of placing a second party

control unit having the second memory by the second party at a desired second party location

determined by the second party, said second party location remote from the first party location.

Using the monitor screen, the user chooses desired data using a control unit and sending the

selection data to the host computer in the same way the initial transmission was sent (Page 4

Paragraph 1). When the desired data has been found, the host computer transmits it to the

personal computer where it is stored on the computer RAM (Page 4 Paragraph 1), which meets

the limitation of connecting electronically via telecommunications lines the first memory with

the second memory such that the desired digital video or digital audio signals can pass there

between, transferring electronically via telecommunications lines the desired digital video or

digital audio signals from a first location with the first memory to the desired second party

location with the second memory while the second memory is in possession and control of the

second party, said second party location remote from said first location, said first memory in

communication with said second memory via the telecommunications lines, storing the digital

video or digital audio signals in the second memory. Akashi discloses automated purchasing of

the digital music is conducted between the host computer and the user personal computer (Page 2

Section 4), and is further detailed on page 3, paragraph 6, through Page 4, paragraph 1. Akashi

does not detail how this automated purchasing procedure is conducted between the host

computer and the user personal computer. Freeny discloses a method of electronically

distributing and selling audio and video data by way of having the requesting user transmit a

consumer credit card number along with their request for the audio and video data (Col. 13, lines

25-29). This step allows the owner of the data to approve the sale and charge the sale to the

consumer credit card number (Col. 13, lines 30-31), which meets the limitation of charging a fee

by the first party to the second party at a location remote from the second party location so the

second party can obtain access to the digital video or digital audio signals processed by the first

party, said first party and said second party in communication via said telecommunications lines,

the step of charging a fee includes the step of charging a fee via telecommunications lines by the

first party to the second party at a location remote from the second party location, the second

party has an account and the step of charging a fee includes the step of charging the account of

the second party, the step of charging the account of the second party includes the steps of

telephoning the first party controlling use of the first memory by the second party; providing a

credit card number of the second party controlling the second memory to the first party

controlling the first memory so the second party is charged money, repeating the charging a fee,

connecting, and transferring stesp. It would have been obvious to one of ordinary skill in the art

at the time the invention was made to have the requesting user's of Akashi transmit a consumer

credit card number along with their request for the digital data so that the source unit could

approve and charge the sale of the digital data to the consumer credit card because this method of

electronic sale allows the owner of the information to receive directly the compensation for sale

of recording and such compensation is received before the reproduction is authorized as taught in

Freeny (Col. 13, lines 36-39). Akashi does not expressly disclose that the personal computer that

receives the digital music data plays the digital music data back after it has been stored on the

storage medium of the personal computer. Eggers discloses a system for the playback of

audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which

contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular

audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the

requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets

the limitation of playing the digital video or digital audio signals stored in the second memory

with the second party control unit. It would have been obvious to one of ordinary skill in the art

at the time the invention was made for the personal computer of Akashi to retrieve the digital

music data from storage upon a user request in order for the user access a large amount of digital

music data without having to utilize the traditional equipment used to playback those files as

taught in Eggers (Col. 14, line 67 – Col. 15, line 5).

38.     Claims 58-61 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432. Referring to claims 58-61, Akashi discloses a system for

automatically selling recorded music via telecommunication lines using a personal computer

(Page 1 through line 1 of Page 2 & Page 3, lines 3-5). Akashi discloses that personal computer

contains a CPU (Figure 1). The personal computer sends an access signal to the host computer,

and the host computer returns a response signal that contains menu data displayed at the personal

computer (Page 3 Paragraph 6). Using the monitor screen, the user chooses desired data using a

control unit and sending the selection data to the host computer in the same way the initial

transmission was sent (Page 4 Paragraph 1), which meets the limitation of placing by the second

party a receiver, and a video display connected to the receiver at the second party location

determined by the second party which is remote from the first party location. When the desired

data has been found, the host computer transmits it to the personal computer where it is stored on

the computer RAM (Page 4 Paragraph 1), which meets the limitation of connecting electronically

via telecommunications lines the first memory with a receiver of the second party while the

receiver is in possession and control of the second party, choosing the desired digital signals by

the second party from the first memory of the first party so desired selections are selected,

transmitting the desired digital from the first memory with a transmitter in control and possession

of the first party to the receiver of the second party while the receiver is in possession and control

of the second party at the second party location determined by the second party. Akashi does not

disclose that the digital data is video data. Freeny discloses a method of electronically

distributing and selling audio and video data by way of having the requesting user transmit a

consumer credit card number along with their request for the audio and video data (Col. 13, lines

25-29). It would have been obvious to one of ordinary skill in the art at the time the invention

was made to distribute video data using the system of Akashi because distributors of video data

would benefit from the cost reduction that would occur when eliminating manufacturing

facilities for reproducing the information in material objects and a distribution network for

distributing the material objects to the various points of sale locations for sale to the consumer as

taught in Freeny (Col. 1, lines 10-26). Akashi discloses automated purchasing of the digital

music is conducted between the host computer and the user personal computer (Page 2 Section

4), and is further detailed on page 3, paragraph 6, through Page 4, paragraph 1. Akashi does not

detail how this automated purchasing procedure is conducted between the host computer and the

user personal computer. Freeny discloses a method of electronically distributing and selling

audio and video data by way of having the requesting user transmit a consumer credit card

number along with their request for the audio and video data (Col. 13, lines 25-29). This step

allows the owner of the data to approve the sale and charge the sale to the consumer credit card

number (Col. 13, lines 30-31), which meets the limitation of charging a fee by the first party to

the second party at a location remote from the second party location so the second party can

obtain access to the desired digital video signals, charging a fee includes the step of charging a

fee via telecommunications lines by the first party to the second party so the second party can

obtain access to the desired digital video signals stored on the first memory, the second party has

an account and the step of charging a fee includes the step of charging the account of the second

party, charging the account of the second party includes the steps of telephoning the first party

controlling the use of the first memory by the second party, providing a credit card number of the

second party controlling the second memory to the first party controlling the first memory so the

second party is charged money. It would have been obvious to one of ordinary skill in the art at

the time the invention was made to have the requesting user's of Akashi transmit a consumer

credit card number along with their request for the digital data so that the source unit could

approve and charge the sale of the digital data to the consumer credit card because this method of

electronic sale allows the owner of the information to receive directly the compensation for sale

of recording and such compensation is received before the reproduction is authorized as taught in

Freeny (Col. 13, lines 36-39). Akashi does not expressly disclose that the personal computer that

receives the digital music data plays the digital music data back after it has been stored on the

storage medium of the personal computer. Eggers discloses a system for the playback of

audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which

contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular

audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the

requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets

the limitation of displaying the desired video signals received by the receiver on the video

display in possession and control of the second party. It would have been obvious to one of

ordinary skill in the art at the time the invention was made for the personal computer of Akashi

to retrieve the digital music data from storage upon a user request in order for the user access a

large amount of digital music data without having to utilize the traditional equipment used to

playback those files as taught in Eggers (Col. 14, line 67 – Col. 15, line 5).

39.      Claims 1, 4, 5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432, in view of Chace, U.S. Patent No. 4,792,974. Referring to

claim 1, Akashi discloses a system for automatically selling recorded music via

telecommunication lines (Page 1 through line 1 of Page 2 & Page 3, lines 3-5). This system

utilizes the telecommunications lines to transmit the recorded music data, stored on a host

computer database (Page 3 Paragraph 4), from a host computer that stores the recorded music

data to a personal computer RAM (Page 2 Sections 4-5), which meets the limitation of forming a

connection through telecommunications lines between a first memory of a first party and a

second memory of a second party control unit of a second party, said first memory having said

desired digital video or digital audio signals. The CPU of the user personal computer (Page 3

Paragraph 6 & Figure 1) meets the limitation of the second party control unit. Akashi discloses

automated purchasing of the digital music is conducted between the host computer and the user

personal computer (Page 2 Section 4), and is further detailed on page 3, paragraph 6, through

Page 4, paragraph 1. Akashi does not detail how this automated purchasing procedure is

conducted between the host computer and the user personal computer. Freeny discloses a method

of electronically distributing and selling audio and video data by way of having the requesting

user transmit a consumer credit card number along with their request for the audio and video data

(Col. 13, lines 25-29). This step allows the owner of the data to approve the sale and charge the

sale to the consumer credit card number (Col. 13, lines 30-31), which meets the limitation of

selling electronically by the first party to the second party through telecommunications lines, the

desired digital video or digital audio signals in the first memory, the second party is at a second

party location and the step of selling electronically includes the step of charging a fee via

telecommunications lines by the first party to the second party at a first party location remote

from the second party location, the second party has an account and the step of charging a fee

includes the step of charging the account of the second party. It would have been obvious to one

of ordinary skill in the art at the time the invention was made to have the requesting user's of

Akashi transmit a consumer credit card number along with their request for the digital data so

that the source unit could approve and charge the sale of the digital data to the consumer credit

card because this method of electronic sale allows the owner of the information to receive

directly the compensation for sale of recording and such compensation is received before the

reproduction is authorized as taught in Freeny (Col. 13, lines 36-39). Akashi discloses that the

host computer then sends the data to the user personal computer RAM (Page 2 Section 5), which

meets the limitation of transferring the desired digital video or digital audio signals from the first

memory of the first party tot the second memory of the second party control unit of the second

party through telecommunications lines while the second party control unit with the second

memory is in possession and control of the second party. Once stored the personal computer

reads the stored digital audio files, or plays the digital audio file (Pages 3-4 Section 6). Akashi

does not expressly disclose that the personal computer that receives the digital music data plays

the digital music data back after it has been stored on the storage medium of the personal

computer. Eggers discloses a system for the playback of audio/video data wherein users

operating a personal computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32),

requests a storage device to retrieve a particular audio/video file (Col. 6, lines 8-15). The

requested file is then pulled from storage and sent to the requesting personal computer for

playback (Col. 6, lines 16-39 & Col. 7, lines 1-5). It would have been obvious to one of ordinary

skill in the art at the time the invention was made for the personal computer of Akashi to retrieve

the digital music data from storage upon a user request in order for the user access a large

amount of digital music data without having to utilize the traditional equipment used to playback

those files as taught in Eggers (Col. 14, line 67 – Col. 15, line 5). Eggers discloses that the

personal computer has a monitor for video output/playback (Col. 4, lines 54) but does not

expressly disclose the form for the audio output/playback. Chace discloses a system for

audiovisual playback using a personal computer (Col. 5, lines 64-65) wherein the audio output

comprises stereo speakers (Col. 7, line 39), which meets the limitation of playing through

speakers of the second party control unit the digital video or digital audio signals in the second

memory, said speakers of the second party control unit connected with the second memory of the

second party control unit. It would have been obvious to one of ordinary skill in the art at the

time the invention was made to use stereo speakers as the audio output in the playback system of

Eggers in order to provide a more realistic and more pleasing sound to the ear as taught in Chace

(Col. 1, lines 32-33).

Referring to claim 4, Akashi does not detail how this automated purchasing procedure is

conducted between the host computer and the user personal computer. Freeny discloses a method

of electronically distributing and selling audio and video data by way of having the requesting

user transmit a consumer credit card number along with their request for the audio and video data

(Col. 13, lines 25-29). This step allows the owner of the data to approve the sale and charge the

sale to the consumer credit card number (Col. 13, lines 30-31), which meets the limitation of the

step of charging the account of the second party includes the steps of telephoning the first party

controlling use of the first memory by the second party; providing a credit card number of the

second party controlling the second memory to the first party controlling the first memory so the

second party is charged money. It would have been obvious to one of ordinary skill in the art at

the time the invention was made to have the requesting user's of Akashi transmit a consumer

credit card number along with their request for the digital data so that the source unit could

approve and charge the sale of the digital data to the consumer credit card because this method of

electronic sale allows the owner of the information to receive directly the compensation for sale

of recording and such compensation is received before the reproduction is authorized as taught in

Freeny (Col. 13, lines 36-39).

Referring to claim 5, Akashi discloses that the host computer then sends the data to the

user personal computer RAM (Page 2 Section 5), which meets the limitation of after the

transferring step, the step of storing the desired digital video or digital audio signals in the

second memory.

40.     Claim 6 is rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432, in view of Chace, U.S. Patent No. 4,792,974 as applied to

claims 1, 4, 5 above, and further in view of Gallagher. Referring to claim 6, Akashi does not

disclose that the host computer encodes the digital music data to prevent unauthorized

reproduction. Gallagher discloses a system for the transfer of recorded data wherein a host

computer transmits digital audio data to user units (Col. 1, lines 13-27). The host computer

provides means for anti-piracy encoding or encrypting the data either generally or uniquely (Col.

1, lines 36-38), which meets the limitation of before the transferring step, the step of

electronically coding the desired digital video or digital audio signals into a configuration which

would prevent unauthorized reproduction of the desired digital video or digital audio signals. It

would have been obvious to one of ordinary skill in the art at the time the invention was made to

encode or encrypt the recorded music data of Akashi in order to provide a possible means for

eliminating borrowing or unlawful copying of the digital music data as taught in Gallagher (Col.

1, lines 51-53).

41.     Claim 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432, as applied to claim 12, and in view of Gallagher, in view

of Ohta, U.S. Patent No. 4,896,237. Referring to claim 13, Gallagher discloses that the host

computer storage means is a hard disk (Col. 1, lines 13-18, 32-33), which is not expressly

disclosed in Akashi. Akashi also does not disclose that the personal computer stores the digital

music data on a hard-disk. It would have been obvious to one of ordinary skill in the art at the

time the invention was made for the host computer storage means of Akashi and the personal

computer storage means of Akashi to be a hard drives because of the vast speed and because

general computer configurations employ disk-based storage systems such as hard disk as taught

in Ohta (Col. 1, lines 21-26). The source unit of Gallagher discloses having a buffer store RAM

(Figures 1-2) between the transmitter and the storage means. It would have been obvious to one

of ordinary skill in the art at the time the invention was made to include RAM in the host

computer of Akashi in order to speed up the transmission process by allowing the transmitter to

access data in RAM as opposed to a permanent storage device which is significantly slower,

which meets the limitation of a sales random access memory. This meets the limitation of the

first memory includes a first party hard disk having a plurality of digital video or digital audio

signals, and a sales random access memory chip which temporarily stores a replica of the desired

digital video or digital audio signals purchased by the second party for subsequent transfer via telecommunications lines to the second memory of the second party; and includes before the transferring step, there is the step of storing a replica of the desired digital video or digital audio signals from the hard disk into the sales random access memory chip.

42.    Claims 7, 8, are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi, "Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view of Eggers, U.S. Patent No. 4,920,432, in view of Chace, U.S. Patent No. 4,792,974, in view of Gallagher as applied to claims 1, 4-6 above, and further in view of Ohta, U.S. Patent No. 4,896,237. Referring to claims 7, 13, Gallagher discloses that the host computer storage means is a hard disk (Col. 1, lines 13-18, 32-33), which is not expressly disclosed in Akashi. Akashi also does not disclose that the personal computer stores the digital music data on a hard disk. It would have been obvious to one of ordinary skill in the art at the time the invention was made for the host computer storage means of Akashi and the personal computer storage means of Akashi to be a hard drives because of the vast speed and because general computer configurations employ disk-based storage systems such as hard disk as taught in Ohta (Col. 1, lines 21-26). The source unit of Gallagher discloses having a buffer store RAM (Figures 1-2) between the transmitter and the storage means. It would have been obvious to one of ordinary skill in the art at the time the invention was made to include RAM in the host computer of Akashi in order to speed up the transmission process by allowing the transmitter to access data in RAM as opposed to a permanent storage device which is significantly slower, which meets the limitation of a sales random access memory. This meets the limitation of the first memory includes a first party hard disk having a plurality of digital video or digital audio signals, and a sales random access

memory chip which temporarily stores a replica of the desired digital video or digital audio

signals purchased by the second party for subsequent transfer via telecommunications lines to the

second memory of the second party; and includes before the transferring step, there is the step of

storing a replica of the desired digital video or digital audio signals from the hard disk into the

sales random access memory chip.

Referring to claim 8, Akashi discloses that personal computer contains a CPU (Figure 1),

which meets the limitation of the second party control unit has a second party integrated circuit

which controls and executes commands of the second party. The personal computer sends an

access signal to the host computer, and the host computer returns a response signal that contains

menu data displayed at the personal computer (Page 3 Paragraph 6). Using the monitor screen,

the user chooses desired data using a control unit and sending the selection data to the host

computer in the same way the initial transmission was sent (Page 4 Paragraph 1), which meets

the limitation of a second party control panel connected to the second party integrated circuit,

and before the forming step, there is the step of commanding the second party integrated circuit

with the second party control panel to initiate the purchase of the desired digital video or digital

audio signals from the first party.

43.     Claims 14-18 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432 as applied to claims 12, 13 above, and further in view of

Ohta, U.S. Patent No. 4,896,237, in view of Thomas, U.S. Patent No. 4,739,398. Referring to

claims 14-17, Akashi discloses that the host computer then sends the data to the user personal

computer RAM (Page 2 Section 5), which meets the limitation of the second memory of the

second party control unit includes an incoming random access memory chip which temporarily

stores the desired digital video or digital audio signals received from the sales random access

memory chip, storing step includes the steps of storing the desired digital video or digital audio

signals in the incoming random access memory chip. Akashi also does not disclose that the

personal computer stores the digital music data on a hard disk. It would have been obvious to one

of ordinary skill in the art at the time the invention was made for the host computer storage

means of Akashi and the personal computer storage means of Akashi to be a hard drives because

of the vast speed and because general computer configurations employ disk-based storage

systems such as hard disk as taught in Ohta (Col. 1, lines 21-26), which meets the limitation of a

second party hard disk for storing the desired digital video or digital audio signals, transferring

the desired digital video or digital audio signals from the incoming random access memory chip

to the second party hard disk, storing the desired digital video or digital audio signals in the

second party hard disk. Eggers discloses a system for the playback of audio/video data wherein

users operating a personal computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines

30-32), requests a storage device to retrieve a particular audio/video file (Col. 6, lines 8-15). The

requested file is then pulled from storage and sent to the requesting personal computer for

playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets the limitation of repeating the

commanding, playing, and transferring a replica steps. Eggers does not disclose that the personal

computers used for playback contain a playback RAM. Thomas discloses an audio and video

playback workstation computer that contains a processor, hard drive, monitor, audio output

device, video playback memory, and audio playback memory (Col. 19, lines 36-50), which meets

the limitation of a playback random access memory chip for temporarily storing the desired

digital video or digital audio signals for sequential playback; commanding the second party

integrated circuit with the second party control panel to play the desired digital video or digital

audio signals and transferring a replica of the desired digital video or digital audio signals from

the second party hard disk to the playback random access memory chip for playback. It would

have been obvious to one of ordinary skill in the art at the time the invention was made to

include an additional RAM in the personal computers of Eggers for playback purposes in order

to reduce the amount of space taken up in system RAM by playback, which would allow more

RAM space for resident programs.

 Referring to claim 18, Akashi discloses that the personal computer has a monitor (Page 4,

Paragraph 1 & Figure 1).

44. Claims 9, 10 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432, in view of Chace, U.S. Patent No. 4,792,974 as applied to

claims 1, 4, 5, above, and further in view of Ohta, U.S. Patent No. 4,896,237, in view of Thomas,

U.S. Patent No. 4,739,398. Referring to claims 9, 10, Akashi discloses that the host computer

then sends the data to the user personal computer RAM (Page 2 Section 5), which meets the

limitation of the second memory of the second party control unit includes an incoming random

access memory chip which temporarily stores the desired digital video or digital audio signals

received from the sales random access memory chip, storing step includes the steps of storing the

desired digital video or digital audio signals in the incoming random access memory chip.

Akashi also does not disclose that the personal computer stores the digital music data on a hard

disk. It would have been obvious to one of ordinary skill in the art at the time the invention was

made for the host computer storage means of Akashi and the personal computer storage means of

Akashi to be a hard drives because of the vast speed and because general computer

configurations employ disk-based storage systems such as hard disk as taught in Ohta (Col. 1,

lines 21-26), which meets the limitation of a second party hard disk for storing the desired digital

video or digital audio signals, transferring the desired digital video or digital audio signals from

the incoming random access memory chip to the second party hard disk, storing the desired

digital video or digital audio signals in the second party hard disk. Eggers discloses a system for

the playback of audio/video data wherein users operating a personal computer (Col. 4, lines 53-

56), which contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular

audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the

requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets

the limitation of repeating the commanding, playing, and transferring a replica steps. Eggers does

not disclose that the personal computers used for playback contain a playback RAM. Thomas

discloses an audio and video playback workstation computer that contains a processor, hard

drive, monitor, audio output device, video playback memory, and audio playback memory (Col.

19, lines 36-50), which meets the limitation of a playback random access memory chip for

temporarily storing the desired digital video or digital audio signals for sequential playback;

commanding the second party integrated circuit with the second party control panel to play the

desired digital video or digital audio signals and transferring a replica of the desired digital video

or digital audio signals from the second party hard disk to the playback random access memory

chip for playback. It would have been obvious to one of ordinary skill in the art at the time the

invention was made to include an additional RAM in the personal computers of Eggers for

playback purposes in order to reduce the amount of space taken up in system RAM by playback, which would allow more RAM space for resident programs.

45.     Claims 25-27 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi, "Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view of Eggers, U.S. Patent No. 4,920,432, in view Ohta, U.S. Patent No. 4,896,237 as applied to claim 12-18 above, and further in view of Gallagher, in view of Thomas, U.S. Patent No. 4,739,398. Referring to claims 25, 27, the source unit of Gallagher discloses having a buffer store RAM (Figures 1-2) between the transmitter and the storage means. It would have been obvious to one of ordinary skill in the art at the time the invention was made to include RAM in the host computer of Akashi in order to speed up the transmission process by allowing the transmitter to access data in RAM as opposed to a permanent storage device which is significantly slower, which meets the limitation of a sales random access memory and first control panel in electrical communication with said first control integrated circuit. Akashi discloses that the host computer then sends the data to the user personal computer RAM (Page 2 Section 5), which meets the limitation of a second control unit comprising a second control panel, a second control integrated circuit, an incoming random access memory. Eggers discloses a system for the playback of audio/video data wherein users operating a personal computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets the limitation of repeating the commanding, playing, and transferring a replica steps. Eggers does not disclose that the personal computers used for playback contain a playback

RAM. Thomas discloses an audio and video playback workstation computer that contains a processor, hard drive, monitor, audio output device, video playback memory, and audio playback memory (Col. 19, lines 36-50), which meets the limitation of a playback random access memory chip in electrical communication with said second control integrated circuit. It would have been obvious to one of ordinary skill in the art at the time the invention was made to include an additional RAM in the personal computers of Eggers for playback purposes in order to reduce the amount of space taken up in system RAM by playback, which would allow more RAM space for resident programs.

Referring to claim 26, Akashi discloses that the telecommunication lines are telephone lines (Page 4, Paragraph 1).

46.    Claim 28 is rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi, "Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view of Eggers, U.S. Patent No. 4,920,432, in view Ohta, U.S. Patent No. 4,896,237, in view of Gallagher, in view of Thomas, U.S. Patent No. 4,739,398 as applied to claims 12-18, 25-27 above, and further in view of Chace, U.S. Patent No. 4,792,974. Referring to claim 28, Akashi discloses that the personal computer has a monitor (Page 4, Paragraph 1 & Figure 1). Eggers discloses that the personal computer has a monitor for video output/playback (Col. 4, lines 54) but does not expressly disclose the form for the audio output/playback. Chace discloses a system for audiovisual playback using a personal computer (Col. 5, lines 64-65) wherein the audio output comprises stereo speakers (Col. 7, line 39), which meets the limitation of speakers in electrical communication with said second control integrated circuit. It would have been obvious to one of ordinary skill in the art at the time the invention was made to use stereo speakers as the

audio output in the playback system of Eggers in order to provide a more realistic and more

pleasing sound to the ear as taught in Chace (Col. 1, lines 32-33).

47.     Claims 32, 33 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432, as applied to claim 29-31 above, and further in view of

Gallagher, in view of Thomas, U.S. Patent No. 4,739,398. Referring to claim 32, the source unit

of Gallagher discloses having a buffer store RAM (Figures 1-2) between the transmitter and the

storage means. It would have been obvious to one of ordinary skill in the art at the time the

invention was made to include RAM in the host computer of Akashi in order to speed up the

transmission process by allowing the transmitter to access data in RAM as opposed to a

permanent storage device which is significantly slower, which meets the limitation of a sales

random access memory and first control panel in electrical communication with said first control

integrated circuit. Akashi discloses that the host computer then sends the data to the user

personal computer RAM (Page 2 Section 5), which meets the limitation of a second control unit

comprising a second control panel, a second control integrated circuit, an incoming random

access memory. Eggers discloses a system for the playback of audio/video data wherein users

operating a personal computer (Col. 4, lines 53-56), which contains RAM (Col. 12, lines 30-32),

requests a storage device to retrieve a particular audio/video file (Col. 6, lines 8-15). The

requested file is then pulled from storage and sent to the requesting personal computer for

playback (Col. 6, lines 16-39 & Col. 7, lines 1-5), which meets the limitation of repeating the

commanding, playing, and transferring a replica steps. Eggers does not disclose that the personal

computers used for playback contain a playback RAM. Thomas discloses an audio and video

playback workstation computer that contains a processor, hard drive, monitor, audio output device, video playback memory, and audio playback memory (Col. 19, lines 36-50), which meets the limitation of a playback random access memory chip in electrical communication with said second control integrated circuit. It would have been obvious to one of ordinary skill in the art at the time the invention was made to include an additional RAM in the personal computers of Eggers for playback purposes in order to reduce the amount of space taken up in system RAM by playback, which would allow more RAM space for resident programs.

Referring to claim 33, Akashi discloses that the telecommunication lines are telephone lines (Page 4, Paragraph 1).

48.     Claims 34 is rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi, "Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view of Eggers, U.S. Patent No. 4,920,432, in view of Gallagher, in view of Thomas, U.S. Patent No. 4,739,398 as applied to claims 29-33 above, and further in view of Ohta, U.S. Patent No. 4,896,237. Referring to claim 34, Gallagher discloses that the source unit stores the data files in a hard drive (Col. 1, lines 32-35), which meets the limitation of the first memory comprises a first hard disk. Akashi also does not disclose that the personal computer stores the digital music data on a hard disk. It would have been obvious to one of ordinary skill in the art at the time the invention was made for the host computer storage means of Akashi and the personal computer storage means of Akashi to be a hard drives because of the vast speed and because general computer configurations employ disk-based storage systems such as hard disk as taught in Ohta (Col. 1, lines 21-26).

49.    Claim 35 is rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music Purchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in view

of Eggers, U.S. Patent No. 4,920,432, in view of Gallagher, in view of Thomas, U.S. Patent No.

4,739,398, in view Ohta, U.S. Patent No. 4,896,237 as applied to claims 29-34 above, and further

in view of Chace, U.S. Patent No. 4,792,974. Referring to claim 35, Akashi discloses that the

personal computer has a monitor (Page 4, Paragraph 1 & Figure 1). Eggers discloses that the

personal computer has a monitor for video output/playback (Col. 4, lines 54) but does not

expressly disclose the form for the audio output/playback. Chace discloses a system for

audiovisual playback using a personal computer (Col. 5, lines 64-65) wherein the audio output

comprises stereo speakers (Col. 7, line 39), which meets the limitation of speakers in electrical

communication with said second control integrated circuit. It would have been obvious to one of

ordinary skill in the art at the time the invention was made to use stereo speakers as the audio

output in the playback system of Eggers in order to provide a more realistic and more pleasing

sound to the ear as taught in Chace (Col. 1, lines 32-33).

50.    Claims 64, 72 are rejected under 35 U.S.C. 103(a) as being unpatentable over Akashi,

"Automated Music P3333urchasing System", in view of Freeny, U.S. Patent No. 4,528,643, in

view of Eggers, U.S. Patent No. 4,920,432, in view of Chace, U.S. Patent No. 4,792,974, and

further in view of Stokes, U.S. Patent No. 4,870,515. Referring to claim 64, Akashi discloses a

system for automatically selling recorded music via telecommunication lines (Page 1 through

line 1 of Page 2 & Page 3, lines 3-5). This system utilizes the telecommunications lines to

transmit the recorded music data, stored on a host computer database (Page 3 Paragraph 4), from

a host computer that stores the recorded music data to a personal computer RAM (Page 2

Sections 4-5), which meets the limitation of forming a connection through telecommunications

lines between a first memory of a first party and a second memory of a second party control unit

of a second party, said first memory having said desired digital video or digital audio signals.

The CPU of the user personal computer (Page 3 Paragraph 6 & Figure 1) meets the limitation of

the second party control unit. Akashi discloses automated purchasing of the digital music is

conducted between the host computer and the user personal computer (Page 2 Section 4), and is

further detailed on page 3, paragraph 6, through Page 4, paragraph 1. Akashi does not detail how

this automated purchasing procedure is conducted between the host computer and the user

personal computer. Freeny discloses a method of electronically distributing and selling audio and

video data by way of having the requesting user transmit a consumer credit card number along

with their request for the audio and video data (Col. 13, lines 25-29). This step allows the owner

of the data to approve the sale and charge the sale to the consumer credit card number (Col. 13,

lines 30-31), which meets the limitation of selling electronically by the first party to the second

party through telecommunications lines, the desired digital video or digital audio signals in the

first memory. It would have been obvious to one of ordinary skill in the art at the time the

invention was made to have the requesting user's of Akashi transmit a consumer credit card

number along with their request for the digital data so that the source unit could approve and

charge the sale of the digital data to the consumer credit card because this method of electronic

sale allows the owner of the information to receive directly the compensation for sale of

recording and such compensation is received before the reproduction is authorized as taught in

Freeny (Col. 13, lines 36-39). Akashi discloses that the host computer then sends the data to the

user personal computer RAM (Page 2 Section 5), which meets the limitation of transferring the

desired digital video or digital audio signals from the first memory of the first party to the second

memory of the second party control unit of the second party through telecommunications lines

while the second party control unit with the second memory is in possession and control of the

second party. Once stored the personal computer reads the stored digital audio files, or plays the

digital audio file (Pages 3-4 Section 6). Akashi does not expressly disclose that the personal

computer that receives the digital music data plays the digital music data back after it has been

stored on the storage medium of the personal computer. Eggers discloses a system for the

playback of audio/video data wherein users operating a personal computer (Col. 4, lines 53-56),

which contains RAM (Col. 12, lines 30-32), requests a storage device to retrieve a particular

audio/video file (Col. 6, lines 8-15). The requested file is then pulled from storage and sent to the

requesting personal computer for playback (Col. 6, lines 16-39 & Col. 7, lines 1-5). It would

have been obvious to one of ordinary skill in the art at the time the invention was made for the

personal computer of Akashi to retrieve the digital music data from storage upon a user request

in order for the user access a large amount of digital music data without having to utilize the

traditional equipment used to playback those files as taught in Eggers (Col. 14, line 67 – Col. 15,

line 5). Eggers discloses that the personal computer has a monitor for video output/playback

(Col. 4, lines 54) but does not expressly disclose the form for the audio output/playback. Chace

discloses a system for audiovisual playback using a personal computer (Col. 5, lines 64-65)

wherein the audio output comprises stereo speakers (Col. 7, line 39), which meets the limitation

of playing through speakers of the second party control unit the digital video or digital audio

signals in the second memory, said speakers of the second party control unit connected with the

second memory of the second party control unit. It would have been obvious to one of ordinary

skill in the art at the time the invention was made to use stereo speakers as the audio output in the

playback system of Eggers in order to provide a more realistic and more pleasing sound to the

ear as taught in Chace (Col. 1, lines 32-33). Akashi discloses that the music data is immediately

readable after it has been downloaded to the user computer and stored on the storage medium

(Page 2, "Operation" section through Page 3, line 1), but does not disclose what type of

information is stored with the music data. Stokes discloses a music memory data recording,

storage and playback system wherein a computer data terminal (Figure 2, element 42), which has

input devices and a monitor (Figure 2), is used along with storage devices and speakers to access

storage audio data (Col. 5, lines 11-48). When the audio data is stored in the system, it is stored

with information that includes the artists name, title, album, playing time, track (song), and

location of the audio data (Col. 1, lines 8-14 & Col. 2, lines 27-20). This information is displayed

when the list of audio data is presented to the user for selection (Col. 2, lines 30-38 & Col. 4, line

65 – Col. 5, line 10, 44-48), which meets the limitation of tagging electronically digital signals

from the second memory. It would have been obvious to one of ordinary skill in the art at the

time the invention was made to provide access/playback system of Stokes in the user personal

computer of Akashi in order for the user of the personal computer of Akashi to be choose which

musical selections are to be played, and in what order as taught in Stokes (Col. 1, lines 56-59).

Referring to claim 72, and in view of the comments made with respect to claim 64 above,

Akashi does not disclose that the digital data is video data. Freeny discloses a method of

electronically distributing and selling audio and video data by way of having the requesting user

transmit a consumer credit card number along with their request for the audio and video data

(Col. 13, lines 25-29). It would have been obvious to one of ordinary skill in the art at the time

the invention was made to distribute video data using the system of Akashi because distributors

of video data would benefit from the cost reduction that would occur when eliminating

manufacturing facilities for reproducing the information in material objects and a distribution

network for distributing the material objects to the various points of sale locations for sale to the

consumer as taught in Freeny (Col. 1, lines 10-26).

### *Allowable Subject Matter*

51.   Claims 69-71, 77-79 are allowed.

52.   Claims 65-68, 73-76 are objected to as being dependent upon a rejected base claim, but

would be allowable if rewritten in independent form including all of the limitations of the base

claim and any intervening claims.

53.   The following is a statement of reasons for the indication of allowable subject matter:

The prior art does not disclose or make obvious an electronic purchasing and distribution system

that allows for user downloaded and stored audio or video files to be tagged as favorite files or

for the audio or video files to be randomly played by a certain artist.

### *Conclusion*

54.   Patent owner's amendment filed 06 February 2006 necessitated the new grounds of

rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See

MPEP § 706.07(a).

A shortened statutory period for response to this action is set to expire **two months** from

the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination**

**proceedings**. The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in

a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required

that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR**

**1.550(c).** A request for extension of time must be filed on or before the day on which a response

to this action is due, and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g).

The mere filing of a request will not effect any extension of time. An extension of time will be

granted only for sufficient cause, and for a reasonable time specified.

The filing of a timely first response to this final rejection will be construed as including a

request to extend the shortened statutory period for an additional month, which will be granted

even if previous extensions have been granted. In no event, however, will the statutory period

for response expire later than SIX MONTHS from the mailing date of the final action. See

MPEP § 2265.

55.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 5,966,440 throughout the course of this reexamination proceeding. The third party

requester is also reminded of the ability to similarly apprise the Office of any such activity or

proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282

and 2286.

56.    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Benjamin E. Lanier whose telephone number is 571-272-3805.

The examiner can normally be reached on M-Th 7:30am-5:00pm; F 7:30am-4pm.

Application/Control Number: 90/007,407

Art Unit: 2132

Page 55

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Gilberto Barron can be reached on 571-272-3799. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Benjamin E. Lanier

GILBERTO BARRON JR.
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2100

Patentability Conferees
Kim Vu   Klu
Gilberto Barron Jr.

PINCHUS M. LAUFER, PH.D., J.D.
SPECIAL PROGRAM EXAMINER
TECHNOLOGY CENTER 2100